EXNER SAND & GRAVEL CORP. v.
SWENSON et al.

THE FLORENCE E.

No. 19026.

United States District Court
E. D. New York.

Feb. 24, 1953.

Purdy, Lamb & Catoggio, New York City, Edmund F. Lamb, New York City, of counsel, for libellant.

Mahar & Mason, New York City, Frank C. Mason, New York City, of counsel, for respondents.

GALSTON, District Judge.

The libellant, as the owner of the Florence E; brings this action to recover damage sustained by the scow while being drydocked by the respondents at their yard. The respondents' ship repair yard is located about midway up the Morris Canal Basin in Jersey City. In drydocking the scow on February 5, 1948, there were found wedged between the tops of the drydock blocks and

the bottom of the scow, in three separate locations, large chunks of ice which damaged the center keelson and the first keelson to the starboard of center, and the bottom planks in those areas. The damage occurred about ten feet from the stern, at another spot about thirty feet from the stern, and at a third point about forty feet from the stern.

It is the libellant's contention that the ice became wedged between the blocks and the bottom of the boat during the process of lowering and raising the dock in drydocking the Florence E, because the respondents performed their work in a negligent manner; and that the presence of the ice between the bottom of the boat and the blocks could have been discovered before the boat was brought completely to bear on the ice.

The respondents, on the other hand, contend that the process of drydocking the Florence E was performed with the care and skill required. They deny that the ice could have become wedged under the scow during the docking operation, contending that the ice must have become adhered to the bottom at some time during her trip up the North River to Tarrytown and back before she was brought to the respondents' yard.

On January 29th, the Florence E was towed from Brooklyn to West New York and then to Tarrytown. She was light and was to have taken on a load of cars at the Chevrolet plant in Tarrytown. The tow consisted of the Florence E and another scow, with one tug towing ahead and two other tugs to help get the tow through the ice to Tarrytown. The Florence E was the first of the two scows in the tow at first, but on the way to Tarrytown, she was shifted behind the other boat because she was leaking in the bow, and, as her captain testified, he "didn't want to take a chance going up the river with a light boat and having some more damage happen".

He also testified that there was "heavy ice" in the river, "all the way up and all the way down"; and that the ice was piling up at the bow when the boat was towing as the head boat.

The scow had sustained ice damage on January 28th or 29th while being towed, either from 34th Street, East River to Brooklyn or from Brooklyn to the Peterson yard in West New York. A survey was arranged for February 2nd at the respondents' repair yard. The survey, which was held with the boat afloat, showed damage in the nature of gouging and cutting to the bow planking near the light water line. It was then arranged between the parties that the boat be drydocked. The testimony is in conflict as to the purpose of the drydocking. Robert Scharf, acting in a managerial capacity with respect to the operation of libellant's scows, states that it was to determine whether there was other damage which could not be discovered in a survey afloat. John Walter Swenson, one of the respondents, denies any such arrangement and asserts that the purpose of the drydocking was to replace the planking found to have been damaged.

The survey of February 2nd, signed by Scharf and Swenson, sets out the damage to the bow planking, the cost of replacement and repair, and includes the words, "Necessary drydocking".

The boat continued to lay in the Swenson yard from February 2nd to February 5th, during which time she was shifted several times. On the latter date she was taken across the slip to the drydock.

The dock is composed of two wings with a pontoon section between them and outriggers or aprons extending from each end of the pontoon section. The two ends are open to permit a boat to be drawn on and off the dock. Three rows of wooden blocks, running lengthwise to the drydock, are placed on the floor of the dock. The bottom of the boat to be drydocked rests on these blocks when it is lifted clear of the water.

The drydocking of a boat is accomplished by sinking the dock, bringing the boat into the dock, centering it over the three rows of blocks so that the two outside rows will bear along the two sides of the boat and the center row of blocks will bear along the center, and then gradually raising the dock so that the bottom of the boat will bear on all the blocks, to raise the boat on an even keel.

The center row of blocks, the keel blocks, are stationary, but the row of blocks on each side, the bilge blocks, are moveable, resting on bearers or tracks running thwartship so that they can be moved in either direction to fit the width of the boat to be docked. The keel blocks are spaced about ten feet apart in the row, while the bilge blocks are from six to ten feet apart. Each block measures 12″ x 12″ x 4′.

On the occasion in question, the Florence E was put on the dock on February 5th. Prior thereto, another boat, the Weldon, had been on the dock, and work had been done on her from February 3rd to February 5th. In describing the operation in taking the Weldon off the dock, Swenson testified:

"A. * * * when we took the Weldon off and raised the dock we then salted our blocking and freed the blocks. Then they were piled by hand an additional footage to give a 36 foot instead of 34 feet. We pulled those blocks to the 36 foot mark. Subsequent thereto we lowered the drydock again and then pulled the Florence E onto the dock, into position, measured her for location, placing her so that she would rest properly on the blocks, and then we pumped the dock, raised the dock and raised the Florence E.

*      *      *      *      *      *

"Q. At the time when the Weldon came off the dock and the dock was raised again in order that you could shift the blocks after salting them, was there any ice on your drydock? A. Well, there was some ice on the dock, yes.

"Q. Was there anything done about that ice * * *? A. You see, when we drop a drydock and we pump it up, the ice that is in and around, the ice will float in and on the dock, so our men on the drydock have long poles, and they take that ice and pole it off or toward the end. The water cannot escape through the sides of the dock and the water will naturally float the ice, and so the only way it can be taken off the dock is at the end. * * *

"Q. Do you know whether or not your men poled ice off the dock—

"Mr. Lamb. On the morning of February 5th.

"A. Yes, sir.

"Q. Did you see it? A. Yes, sir."

Finn Nelson, assistant dockmaster at Swensons' yard on February 5th, participated in the docking operations that day, and he agreed with Swenson as to the moving of the blocks and the poling off the ice floating in the dock as the boat was brought in.

Harry Howland, another employee of the respondents, was stationed on the Florence E during the docking operation. Gus Podella, employed by the respondents, also participated in the docking and was stationed on the wing of the dock. Their testimony is substantially the same as that of Swenson and Nelson.

There is no dispute among the witnesses that there was ice in Morris Canal Basin on February 5th. However, as to the thickness and character of this ice, the testimony is conflicting.

John Kopcha and Christopher Wade, tugboat captains employed by the Lehigh Valley Railroad, testified that they had shifted barges in the Morris Canal Basin on February 4th and 5th respectively, and that there was "heavy ice" on those days in the slips in the Canal. No explanation was given as to what constituted "heavy ice" except that it was not just sheet ice and that it was necessary to break the ice for their tugs to place a barge in a slip.

Swenson stated that the ice in the vicinity of the dock "ran anywhere from two inches to four—four and a half inches in thickness." Finn Nelson was shown Exhibit G, showing a block of ice measuring about twenty inches in thickness which was found on the floor of the dock when the Florence E was raised. He denied that there was any ice like that shown in Exhibit G on the dock before the boat was put on the dock.

The respondents also called John L. Waldie, manager for the George J. Waldie Company, scow owner, who was present at

the respondents' yard on February 5th in connection with repairs on a scow of the Waldie Company. He gave the following testimony:

> "Q. Was the ice in the waters of the slip and basin adjacent to the drydock of the same dimension and thickness as these cakes which you saw underneath that boat after the accident? A. No."

Accepting the presence of some fresh water ice in the Morris Canal Basin, although the respondents sought to establish that the ice around their plant was salt water ice only, the question still remains as to the size of the blocks of ice in and about the dock of the respondents. The testimony as to size ranges from that of Scharf and Agedson [1] of cakes between a foot and two feet in width, and five to ten feet in length to Swenson's estimate that the ice was but four to four and a half inches in thickness. The respondents' witnesses testified that the pieces of ice in the Basin were not so large as the pieces found wedged under the Florence E. Moreover, there is some testimony given by Swenson that the appearance of the ice under the bottom of the Florence E, as to color and texture, indicated to him that it was similar to that delivered to homes. It was clear, hard ice, as distinguished from the appearance of the salt water ice in the Morris Basin which Swenson described as "mushy and pockmarked and whitish in color, and not clear".

The Florence E was not drawn into the dock until it was submerged to a point where the floor of the dock was at least ten feet under the surface of the water. The scow was drawing three feet to three and a half feet light, as she then was, and was pulled into the dock very slowly. In the process of being pulled into the dock it was not unreasonable to expect that the bow of the boat would push any ice floating inside the dock ahead of it. Since there was a distance of some seven feet between the bottom of the boat and the floor of the dock, there would be no danger that the ice being pushed ahead of the bow would

adhere to the blocks. Agedson stated that the boat was drawn in "free", meaning he felt no obstruction at the time. The evidence also is that any floating pieces of ice not pushed off the dock in this manner were poled off by the men. The poling was done by pushing the floating ice to either the bow or the stern. There is nothing in the evidence which would indicate that any ice was pushed under the boat by the poling.

The respondents' witnesses who took part in the docking operation all testified that the drydock was raised after the Weldon was taken off, and before the Florence E was taken on, for the purpose of salting and moving the bilge blocks. This was necessary because, as they claimed, the Weldon's beam measured thirty-four feet, while the beam of the Florence E was thirty-six feet. The consolidated certificate of enrollment and license of the Florence E showed the registered breadth of the scow to be thirty-four and one-tenth (34.1) feet. The "register breadth" as defined in the publication Merchant Vessels of the United States (1948), read in as part of the record of this case by libellant, is as follows:

> " * * * the breadth at its widest part measured from the outer side of the planking or plating on one side to the corresponding point on the opposite side."

The survey of February 2nd shows the dimensions of the bottom planking of the boat to be four feet by ten feet by thirty-six feet. Swenson stated that the dimension thirty-six feet indicated the width or beam of the scow at the bottom. It may well be that this dimension as shown on the survey was what the respondents relied upon in shifting the bilge blocks. The libellant, on its part, relies entirely on the certificate of enrollment. On the basis of the certificate, it contends that since the Florence E was no wider than the Weldon, there was no need to move the bilge blocks. It is further contended that since there was no such need, the blocks were not moved; and since the only reason for raising the dock light was to move the blocks, it was not raised at

---

1. Captain of the Florence E.

all between the time the Weldon was taken off and the Florence E put on.

But, as has been said hereinbefore, the scow was towed through heavy ice on the trip to Tarrytown and back. This, according to the respondents, is how the ice probably became wedged under the Florence E.

Respondents' witness, Howland, testified to an experience, when he was master of a barge, of towing through ice to Cementon, near Kingston, New York, and later seeing cakes of ice come up to the surface of the water from under his boat when it was being moved after lying in a pier in Brooklyn for two or three weeks following the Cementon trip. There was no ice in the slip in Brooklyn at the time of this incident.

The libellant called some experts to disprove the position taken by the respondents in their explanation of the ice accumulation. Kenneth F. Terry was asked whether the ice shown wedged under the Florence E could have been picked up in the upper Hudson River and remained adhered to the bottom until she had been drydocked. His answer was as follows:

"My opinion is that the ice wouldn't stay under the bottom of the boat that long if the boat was in motion, which this boat apparently was."

It may be noted that he did not say the ice could not have adhered in the first place to the bottom of the boat in the manner described. However, Frank E. Bagger, another expert called by libellant, said he did not believe that the ice could have adhered to the bottom of the scow under those conditions.

"Q. Can you explain that, Mr. Bagger? A. I will explain it by the very fact that she was towing—principally by the fact that she was towing. Furthermore, I would say that after all the temperature of the water would tend to release it. Further, that the only cases that I have ever encountered of ice causing damage in drydocking was ice floating on the dock or adhering to the dock and becoming loosened. I have never seen an actual case where ice remained adhering to the wood."

As has been noted, libellant also contends that the respondents, if they had exercised proper care, could have discovered the presence of the bocks of ice wedged under the bottom of the boat before damage was caused. Nelson and Podella testified to hearing "cracking and creaking" noises during the drydocking operation, just before or as the bottom of the boat started to bear on the blocks. Libellant contends that if the respondents or their employees had stopped the raising operation when this noise was heard, and made proper inspection, they could have prevented damage being done to the boat. It also contends that the respondents should have suspected something wrong since the wedged ice would cause the stern to be higher as the boat was lifted on the blocks, and the gauges along the wings of the drydock would disclose the fact that the boat was not coming up on even keel.

Swenson and Nelson state that it is not unusual to hear cracking noises as a boat is being raised—e. g. when a boat has what is called a hogged condition, making it higher, or sometimes lower, in the middle than at the ends. The noises would indicate, they say, that the ship was finding its shape on the blocks. Swenson further declared that even if he suspected ice had become wedged under the bottom, he nevertheless would consider it proper to go through with the raising operation. He gave his reason as follows:

"A. Well, I wouldn't know if such a situation was a fact, and if damage might occur it could be that you could have a log underneath and you could push a hole in the bottom of the boat and if you dropped it off the dock, well, you might punch a hole and the boat would fill with water and sink in the drydock. If there was any damage done there would be nothing to be gained by dropping it off."

Terry, libellant's expert witness, differed. He stated that he would consider the cracking noise as a warning and that an investigation should then be made. On cross-examination he agreed though that there are apt to be noises on a boat during dock-

536

ing when she changes shape. The following questions and answers were given:

"Q. Every time a boat cracks as she is taking the blocks at College Point, did you put the boat back overboard? A. No, sir.

"Q. Why not? A. Well, because from experience I have used my judgment as to whether there was something that was normal or abnormal."

Bagger agreed with Terry that the raising should have been stopped and an internal inspection made when the cracking noise was heard. It was not explained, however, what could be ascertained by an internal inspection were the raising operation stopped on hearing the cracking noise.

Although there was considerable testimony in respect to the cracking noises, no testimony was adduced otherwise identifying this noise. If the noises heard on the occasion in question were of a different character than the kind of noises heard when a boat is "finding her shape" on the blocks, it might be argued that they constituted notice to the respondents of a condition out of the ordinary. The libellant points to the fact that one of Swenson's men reported the cracking noise to him as indicating that the noise should have constituted some sort of a warning. On the other hand, Agedson, who was on the boat during the raising operation, did not testify to hearing any noise at all. In this connection it may be noted that the testimony of the expert witnesses Terry and Bagger was given without any identification of the noise except that it was a "cracking noise". It may have been presumed that since damage had been done, the cracking noise should have been warning of the damage; but that would be begging the question.

With respect to the contention that the wedged ice would have caused the boat to come up stern-high, which fact should have served as warning of some irregularity, Agedson stated that the Florence E had a stern drag of about fourteen inches. The exhibits showing the ice wedged between the blocks and the bottom of the boat indicate that the ice was compressed by the weight of the boat. Swenson stated that the thickness of the wedged blocks of ice was between six and ten inches in their compressed state. Robert H. Sweeney, a marine surveyor, who represented the libellant at the survey conducted to determine the extent of the damage, stated that the blocks of ice were six inches, eight inches and eighteen inches in thickness. He also testified that the exhibits do not indicate the full width of the blocks of ice, but that the planks and the keelsons actually were forced up and the ice had pushed up into the interior of the boat.

In view of the stern drag and the fact that the wedged ice was compressed and forced through the planking from the weight of the boat, it cannot be said that there was such a tilt that the respondents knew or should have known of some obstruction between the blocks and the bottom of the boat.

The parties are agreed that the situation presented is one of bailment, when the Florence E was taken to the respondents' yard for work to be done on her by them and their employees. The undertaking assumed by the respondents required them to exercise ordinary care. Ordinary care in this instance means the care and skill necessary for due performance of the work in which the respondents are engaged, viz., the drydocking and repair of vessels. International Mercantile Marine S.S. Co. v. W. & A. Fletcher Co., 2 Cir., 296 F. 855.

Nor do the parties controvert the applicability of the principle that since exclusive control of the drydocking operation was in the respondents as bailees, the fact that damage occurred raised a "presumption" of fault on their part, requiring them to go forward with evidence to rebut that presumption. Libellant admits, however, that the ultimate burden of proof is upon it to show that the damage was due to the lack of reasonable care, in all the circumstances, on the respondents' part. The rule of law is set forth in Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, at pages 110–111, 62 S.Ct. 156, 161, 86 L.Ed. 89:

"The burden of proof in a litigation, wherever the law has placed it, does not shift with the evidence, and in de-

termining whether petitioner has sustained the burden the question often is, as in this case, what inferences of fact he may summon to his aid. In answering it in this, as in others where breach of duty is the issue, the law takes into account the relative opportunity of the parties to know the fact in issue and to account for the loss which it is alleged is due to the breach. Since the bailee in general is in a better position than the bailor to know the cause of the loss and to show that it was one not involving the bailee's liability, the law lays on him the duty to come forward with the information available to him. * * * If the bailee fails it leaves the trier of fact free to draw an inference unfavorable to him upon the bailor's establishing the unexplained failure to deliver the goods safely. * * *

"Whether we label this permissible inference with the equivocal term 'presumption' or consider merely that it is a rational inference from the facts proven it does no more than require the bailee, if he would avoid the inference, to go forward with evidence sufficient to persuade that the non-existence of the fact, which would otherwise be inferred, is as probable as its existence. It does not cause the burden of proof to shift, and if the bailee does go forward with evidence enough to raise doubts as to the validity of the inference, which the trier of fact is unable to resolve, the bailor does not sustain the burden of persuasion which upon the whole evidence remains upon him, where it rested at the start."

From the fact of the damage, the libellant would have the court infer that there was so much ice in the respondents' yard at the time of the docking operation, some of it was carried into the dock at the time, and though failure to keep it out, some pieces were swept under the boat during the process of lowering the dock and then raising it. The respondents deny that there was as much ice around their dock as libellant contends, and state that although there was ice in and around their yard, the size of the pieces of ice floating in the water was nowhere near the size of the blocks found wedged under the Florence E. Moreover, they state that they docked the boat in the usual manner, using the required skill in performing the operation, including the precaution of poling out floating ice which had come into the dock when it was lowered preparatory to putting on the Florence E.

█ It must be concluded that the respondents have produced evidence sufficient to raise doubts as to the validity of the inference which libellant seeks to have established.

Aside from the question of accepting the respondents' theory above, however, there is the issue of whether they exercised the care required of them in drydocking the Florence E. Unless it can be said that the libellant has substantially discredited the evidence of the respondents on this issue, it must be concluded that the libellant has not sustained its burden of proof. The evidence adduced by the libellant still leaves doubt with respect to the size of the blocks of ice in and around the drydock on February 5th. The evidence also fails to show that there was any ice, approaching the size of that found wedged under the boat, on the dock before it was sunk to put on the Florence E. Nor does it disclose that the respondents and their employees failed to clear floating ice off the dock according to their customary practice. In addition to the testimony already discussed, Swenson testified as follows with respect to precautions taken:

Q. After you lower the dock, any ice that is on the floor of the dock would go below the surface of the water unless it floated up free; right? A. No, no ice that is on the dock ever goes below the surface of the water in our dock, and I don't believe in any other dock in New York Harbor.

* * * * * *

"Q. Why? A. Because it is a customary practice that we have observed and everybody else observes that when you have snow or any ice on a dock, before you ever lower it you free it

up. It would be suicidal if you didn't. You will always free up ice before you would ever lower it. Now, we had just taken the boat off within an hour, and whatever inflow of ice had come in on the dock that had been poled off, that had been freed up. * * *"

In sum it must be concluded that the evidence is not sufficiently conclusive either way to prove how the damage was caused. However, the respondents have presented enough evidence to raise doubts as to that issue—doubts which the court is unable to resolve on the record. The libel will be dismissed.

Appropriate findings of fact and conclusions of law will be filed with this opinion.