**EXNER SAND & GRAVEL CORPORATION, as owner of THE Scow FLORENCE E, Libellant,**

v.

**PETTERSON LIGHTERAGE & TOWING CORP., Respondent.**
Civ. A. 19025.

United States District Court
E. D. New York.
April 23, 1957.

Purdy, Lamb & Catoggio, New York City, Proctors for libellant, for the motion, by Vincent A. Catoggio, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, Proctors for respondent, by Edward L. Smith, New York City, of counsel.

RAYFIEL, District Judge.

The libelant sued to recover a judgment for the damage sustained by its barge, Florence E., which had been chartered to the respondent in good condition, and returned damaged.

An interlocutory decree was entered herein by Judge Galston on January 25, 1955, pursuant to a stipulation between the parties. It provided that the libelant recover from the respondent the damages sustained by it, together with interest and costs, and that the matter be referred to Harry E. Yerkes, Jr. Esq., as Special Commissioner, to ascertain and compute the amount of the damage sustained by the libelant, and report thereon to the court.

The Special Commissioner took testimony and subsequently filed his report, dated December 19, 1956, wherein he found that the libelant's damage amounted to $525, consisting of bow repairs of $459 and demurrage of $66. The libellant excepted to the report on the ground that "it is contrary to the facts, contrary to the evidence, contrary to applicable law and is clearly erroneous," and has moved to sustain said exceptions.

Because of the sharp conflict as to the amount of the damage for which the respondent was liable it is necessary to carefully review the facts on which the Special Commissioner based his decision.

On January 29, 1948 the libelant, through its agent, Zeller Marine Corporation, chartered its barge, Florence E., to respondent under the usual New York Harbor form of demise charter for an indefinite term at an agreed rate per day, the libelant to furnish a barge captain. She was towed from Pier 22, Brooklyn, on January 29, 1948, at 4:20 a. m. to Pier F, Jersey City, and then, at about 7:20 a. m., to Lord's Drydock, respondent's yard. It was very cold and there were ice floes in and about the harbor through which the barge was towed. When she arrived at Lord's Dry Dock the bargee discovered that a plank near the starboard corner of her bow had been damaged and she was leaking slightly. Thereafter, at about 9:15 a. m., the Florence E. and another barge, the Cleary No. 78, were taken in tow by the respondent's steam lighter, Pacific. They were made up tandem fashion, connected by short hawsers, with the Florence E. leading. The barges were being towed up the Hudson River to Tarrytown, New York. The respondent's tugboats, the Ellery Wright and the Bonn, accompanied the tow. When it reached the vicinity of the George Washington Bridge the bargee aboard the Florence E. reported to the mates aboard either the Pacific or the Bonn that she was leaking, and suggested that she be placed behind the Cleary 78. This was done, and the tow continued to Tarrytown, where it was to pick up crated automobiles from the Chevrolet plant located there. Because of the heavy ice in the river between the tow and the pier at the Chevrolet Plant, the Ellery

Wright and the Bonn were unable to clear a channel to permit the Pacific and the barges to reach the pier. Accordingly the flotilla returned to Lord's Dry Dock, arriving there at about 6:10 p. m. on January 29, 1948. Both barges remained there until about 7:00 p. m. on January 30, 1948, when they were towed by the tug Bonn, first to the Cleary Shipyard in New Jersey, where the Cleary 78 was dropped, and then to Swenson's Repair Yard in Jersey City, where the Florence E. was tied up alongside a coal barge.

On February 2, 1948, while the Florence E. was afloat, a survey thereof was made which disclosed an estimated bow damage of $459. The survey was signed by John Swenson, Jr., of John Swenson Drydocks, and Robert Scharf, the Treasurer of the libelant, and was marked respondent's Exhibit A before the Special Commissioner. On February 5, 1948 the Florence E. sustained damage to her bottom while she was being placed in dry dock. A survey of that damage, made on February 6, 1948, while she was in dry dock, estimated the cost of the repairs at $11,565. It was signed by Mr. Scharf and two others, and was marked as libelant's Exhibit 6 before the Special Commissioner. On February 11, 1948, another survey of the vessel was made while she was in dry dock. It disclosed damage to her bow, port and starboard sides, the cost of repairing which was estimated at $7,097. This survey was signed by representatives of the libelant, the owners of the drydock and the hull underwriters, and was marked libelant's Exhibit 8 before the Special Commissioner. Because of the fact that some of the items of repairs indicated in the second and third surveys would duplicate or overlap others the libelant has adjusted the cost of the repairs to the bottom listed in libelant's Exhibit 6 to $9,830, and the cost of the repairs to the bow and sides listed in libelant's Exhibit 8 to $4,537.

The libelant then commenced an action in this court against the owners of the John Swenson Dry Docks for the damages sustained by the Florence E. while she was being drydocked. It was tried before Judge Galston who found that the libelant had "failed to sustain its burden of proving that the drydocking operation was not carried out by experienced men with that degree of care required of them in their calling." See Judge Galston's Conclusion of Law No. 2, libelant's Exhibit 2, before the Special Commissioner. He dismissed the libel. See D.C., 110 F.Supp. 531, affirmed, 2 Cir., 212 F.2d 205. The instant action was then commenced, the interlocutory decree entered pursuant to stipulation, and the reference ensued.

Some 231 pages of testimony were taken before the Special Commissioner, who filed a forty page report in which he found that the scow was delivered to the respondent in good condition; that the bottom damage was caused by the Swenson Dry Dock, a yard selected by the libelant to repair the damage sustained during the charter period; that the side damage *could* have been sustained during the trip to Tarrytown and return, but that the libelant had not eliminated the possibility that it *could not* have occurred during the period from January 30, 1948 to February 5, 1948, when the barge was in Swenson's Dry Dock.

The Special Commissioner properly rejected the libelant's contention, repeated on this motion, that the respondent should be held liable for the bottom damage which occurred at Swenson's Yard, inasmuch as it would not have occurred if the initial bow damage had not made it necessary to place her in dry dock. The libelant cited no authority to the Commissioner or the Court to support that contention. All the cases it cited refer to *personal injury cases*, in which the initial injury was aggravated by subsequent treatment or injury. The Commissioner correctly stated that the rule in property-damage cases was that enunciated in Cleary Bros. v. Port Reading R. Co., 2 Cir., 29 F.2d 495, at page 498, in which the Court said: "Ordinarily the first wrongdoer is not held responsible for damages which result both

from his own negligence and that of a subsequently intervening third party, *unless the latter's negligence was such as the first wrongdoer might reasonably have expected to occur.* See The Panther, 2 Cir., 5 F.(2d) 64; The George H. Jones, 2 Cir., 27 F.(2d) 665, 668; The M. E. Luckenbach, D.C.E.D.N.Y., 200 F. 630, affirmed, 2 Cir., 214 F. 571. This rule is commonly expressed in terms of causation—the second wrongdoer's negligence being called the proximate cause—though really its source is to be found in the courts' conceptions of policy and fairness, rather than in any factual relation of causation. See Green, Proximate Cause, § 4." (Emphasis added.) See also P. Dougherty & Co. v. United States, 3 Cir., 207 F.2d 626, 627, at page 630.

■ Respecting the side damage listed in the survey dated February 11, 1948, I do not believe that the libelant has sustained its burden of proof that it occurred on the trip to Tarrytown and return. I have read the testimony taken before the Commissioner very carefully, with particular emphasis on the testimony of Fred S. Ageton, who was the Captain of the Florence E. I have not had the advantage of seeing and hearing Captain Ageton testify and I am, therefore, obliged, as stated by Judge Medina in Deep Sea Tanker, Limited v. The Long Branch, 2 Cir., 242 F.2d 433, 434, to "decide all questions, including those related to the credibility of witnesses, from the cold record". However, I am satisfied that he was a truthful and forthright witness, and I was impressed by his testimony. Judge Learned Hand had occasion, in the case of Cranberry Creek Coal Co. v. Red Star Towing & Transportation Co., 2 Cir., 33 F.2d 272, to characterize bargees as "feckless folk". He could not have had men like Ageton in mind, for here was a bargee who, since 1926 had held a chief mate's license, on any ocean, and for any gross tonnage, and who had served in the United States Navy as a rated quartermaster, third class. He was aboard her during the entire trip in question. The *only* damage

sustained by the barge during the charter period, according to Captain Ageton, was the damage to the bow plank, the testimony concerning which appears on page 12 and 13 of the minutes: "Q. Now, after arriving at Lords Dry Dock on the 29th of January, will you state whether or not you found any leak in your scow? A. Yes, sir, I found a damaged plank on the bow, starboard corner, about two and half, three planks up.

"Q. Was the scow leaking? A. It was a little bit.

"Q. Then what happened after that? A. I called the mate." A reading of the minutes indicates that he had very complete notes, copied into the log, from which he testified about the trip to Tarrytown and return in great detail. There was *no* testimony on his part to the effect that the barge was damaged on that trip, nor was there *any* testimony that either the steam lighter Pacific, or the tugs Ellery Wright or Bonn, rubbed her sides, collided with her or did the damage complained of. In fact, the testimony discloses that he did not even look for any damage, except that to the bow, prior to the survey of February 2, 1948. His testimony as to that was as follows: (see minutes, page 26) "Q. Now, did you notice any damage on the side of your craft while you were laying in the basin? A. Well, I didn't look at the side, and there would be no leaks inside. I wouldn't notice that because I wasn't looking for damage, I was waiting for the survey to be held." If there had been any other damage, I believe that Ageton, who was the only person aboard the Florence E. and the only possible eye witness of any damage to her during the trip, would have either felt or seen it happen, reported it to the libelant, as he did the bow damage, and testified respecting it before the Special Commissioner. His testimony that he did not look for any other damage was corroborated by Scharf, who testified, at page 40 of the minutes, respecting the survey of February 2nd, as follows:

"Q. When was the first time you saw it in the basin? A. The day of the

survey, I think it was the 2nd of February.

"Q. That was the first time? A. Yes.

"Q. And did you go into the interior of the vessel? A. Yes.

"Q. At that time? A. Yes.

"Q. Did you look at the outside? A. No.

"Q. You mean you couldn't see the outside? A. I could see the outside, but I did not inspect the outside.

"Q. You were inspecting for damage? A. Yes, sir.

"Q. If you saw it you would have noted it? A. Yes, I was only looking for the visible damage.

"Q. You were surveying the damage while she was under charter to Petterson, is that correct? A. Yes." and again, at page 42, "Q. What damage were you surveying? A. *All the damage that we found.*" (Emphasis added.)

Accordingly the motion is denied, and the report of the Special Commissioner is confirmed.