**LONG ISLAND RAILROAD COMPANY,**
as owner of THE tug PATCHOGUE,
Libellant,

v.

**THE Carfloats NEW YORK CENTRAL NO. 25 and THE NEW YORK CENTRAL NO. 66** and The New York Central Railroad Company, Respondent,

and

**THE Carfloat LEHIGH VALLEY NO. 1703 and THE tug LEHIGH VALLEY HAZELTON** and Lehigh Valley Railroad Company, as owner of said carfloat and tug, Respondent-Impleaded.

United States District Court
S. D. New York.
March 25, 1960.

Burlingham, Hupper & Kennedy, New York City, for libellant. Kenneth Volk, New York City, of counsel.

Gerald E. Dwyer, New York City, for respondent. William F. McGinn, New York City, of counsel.

Pyne, Brush, Smith & Michelsen, New York City, for respondent-impleaded. Albert Robin, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

This is a libel *in personam* against the New York Central Railroad (Central) and *in rem* against Central Carfloats Nos. 66 and 25, brought by the Long Island Railroad (Long Island) for collision damage to its tug Patchogue. The respondent impleaded the Lehigh Valley Railroad (Lehigh) pursuant to Admiralty Rule 56, 28 U.S.C.A. The jurisdiction of this court and the ownership of the various vessels is admitted. The facts are as follows.

On December 18, 1953, the Long Island tug Patchogue was properly moored port

side to a wharf at Long Island City known as the "Oil Dock". The Patchogue was at that time in inactive service and had been so moored for some time. No crew was aboard. Prior to 7:00 a. m. on that day carfloat 1703 owned by Lehigh was moored alongside the east bulkhead at the "Pine Dock", located approximately 500 feet south of the Oil Dock. Between 7:00 and 7:35 a. m. Central's Tug No. 32 moored Central Carfloats Nos. 66 and 25 alongside Lehigh's No. 1703, No. 25 being outboard. Nos. 66 and 25 were lashed together and a single 5½-inch hemp line ran from the bow of each to the east edge of Pine Dock. Both floats were secured at the stern by only a looped 5½-inch hemp line running from No. 66's starboard stern to the port side of Lehigh's 1703. On December 18, Nos. 66 and 25 were heavily laden with railroad cars. No. 66 was the longest carfloat in service in the area and it extended about 60 feet beyond the end of the Pine Dock. Thus a wind from the south would not only catch No. 66 broadside, but would play against 60 feet of freeboard unprotected by any dock.

At aproximately 9:00 a. m. on December 18 the Lehigh Tug Cornell "drilled out" Lehigh's No. 1703. That is, the tug's crew removed the 1703, the most inboard of the three moored floats, and towed it away, resecuring the two remaining floats. It seems clear from all the evidence that in carrying out that operation the crew of the Cornell did not disturb the bow lines of Nos. 66 and 25, but merely took No. 66's starboard stern line, which had been attached to No. 1703, and resecured it to the south edge of Pine Dock after No. 1703 was drilled out. Counsel for respondent conceded that so far as Central knew, the stern line of No. 66 was the property of Central.

According to the witness Otto Muller, boat dispatcher for Long Island, who on the day of the accident was in his office on the second floor of a building approximately 900 feet from the Pine Dock, December 18th was clear and until about 1:00 p. m. the wind was from the northwest. Thus, until about 1:00 p. m., the wind tended to push the floats against the south edge of the dock to which they were moored. At about 1:00 p. m., however, Muller (whose window was open) felt the wind suddenly shift and freshen, becoming a gusty 20 to 25 miles per hour wind from the southwest. Going to his window at that moment he saw Central's Carfloats Nos. 66 and 25, still lashed together, drift across the slip, the port stern of No. 25 striking the starboard stern of the Patchogue. The bow and stern lines of No. 66 were parted.

It was stipulated by the parties that on December 18, 1953 high water in the East River came at 7:42 a. m. and 8:09 p. m., while low water came at 1:13 a. m. and 2:02 p. m., and that the drop between high and low water was approximately 5.2 feet. Thus, at 9:00 a. m., when the stern line of No. 66 was resecured, the tide had been dropping for approximately 1¼ hours and at 1:00 p. m., when the barges drifted free, approximately one hour of tide fall remained. There was no evidence of the exact amount of tidal drop between 9:00 a. m. and 1:00 p. m. at the Pine Dock, but accepting the 5.2 figure, and assuming that the tidal fall was regular, approximately 64% of the drop took place between those hours, that is, approximately 3.33 feet.

 When a vessel properly docked is struck by a moving or drifting vessel, the burden is upon the moving vessel to show that the collision could not have been avoided by care and good seamanship. In The Louisiana, 1865, 3 Wall. 164, 173, 70 U.S. 164, 173, 18 L.Ed. 85 the Court stated:

"The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a *vis major*, which human skill and precaution, and a proper display of nautical skill could not have prevented." See also, The Havana, 2 Cir., 1937, 89 F.2d 23, 24; Patapsco Scrap Corp. v. Maryland

Shipbuilding & Drydock Co., 4 Cir., 1959, 268 F.2d 817, 819–820.

It is clear beyond peradventure that the Central must be liable unless it can show that some force beyond its control propelled its vessels into the unoffending Patchogue. Certainly the 25 miles per hour wind does not amount to *vis major*. The most reasonable deduction to be drawn from the accident, in the absence of other evidence, is that the lines on No. 66 were inadequate to their task and such a finding would amount to negligence on the part of the respondent.

■ Indeed, the respondent does not rely on *vis major* or a like defense. Instead, it accepts the conclusion that the accident was caused by improper mooring but contends that the fault was Lehigh's. Its position is that Lehigh's servants in "drilling out" its No. 1703 neglected to leave sufficient line at the stern of No. 66 to absorb the tidal drop, and that as the ship settled in the water the line tautened, chafed against the concrete dock edge, and then broke. Lehigh of course contends that the parting of No. 66's lines was caused by a defect in one or both of them. On this issue Central likewise has the burden of proof in seeking to establish the affirmative negligence of Lehigh. There is testimony in the record that the stern line of No. 66 appeared only 10 to 14 feet in total length after having parted. Since the stern line was "double", i. e. looped, accepting that estimate would require a finding that the line's length from the deck of No. 66 to the dock was from five to seven feet. It should be emphasized at this point, however, that these measurements were merely the rough estimates of witnesses, made from a distance. If I were to accept them as accurate I would have to find that the stern end of No. 66 was almost snubbed against the Pine Dock. For, taking the length of six feet, accepting the uncontradicted testimony that the deck of No. 66 would be three feet below the edge of the dock at 9:00 a. m., and allowing one foot of line to go around the dock stanchion, there would have been only two feet of play left in the stern line.

I cannot accept Central's argument without evidence to support it, that Lehigh's very experienced tugmen, who testified that it was their practice to leave sufficient line out to compensate for tidal fall, would have left only two feet of play in a line securing two heavily laden carfloats. To make such a finding I would need far more cogent and accurate evidence of the actual length of the line than was provided by Central. It should be noted that Lehigh was prevented from presenting evidence as to the actual length of the line by Central's unexplained failure to have it produced either at the trial or before.

This failure either to present the lines of No. 66 in court, or to offer any expert opinion as to their condition, or to offer any testimony in regard to them beyond that of witnesses who admittedly made only a cursory inspection, has other, more significant, consequences. The only testimony in regard to the condition of these lines was: (1) Witness Muller's accident report (libellant's exhibit No. 5), which stated "Starboard stern line on N.Y.C. 66 unravelled"; (2) testimony by Captain Drago, who was on the tug that tied up the floats 66 and 25 to the 1703, that he had "handled" the line several times on the evening before the accident and that the line was "good"; and (3) testimony by Patrick Phillips, a deck hand on the Central tug which towed the floats away after the accident that the line was "good" and that it was "chafed" where it parted. There was no expert testimony as to the adequacy of a single 5½-inch hemp line to secure two carfloats lashed together, both heavily laden and one the largest in local service, against a gusty 20 to 25 mile per hour wind hitting broadside against an unprotected 60 feet expanse of freeboard. True, Captain Drago testified that such a line could withstand "considerable strain", but that is hardly sufficient to establish the adequacy of the lines in question to withstand the force to which they were subjected in the instant case.

■■ It is well established that when important and vital evidence is available

and is not produced, the conclusion to be drawn is that such production would have disclosed facts adverse to the case of the party in custody of that evidence. See, The Colon, 2 Cir., 1918, 249 F. 460, 462; The John and Frederick, D.C.E.D.N.Y. 1935, 10 F.Supp. 666, 668; The Algie, D.C.E.D.N.Y.1932, 56 F.2d 388, affirmed 2 Cir., 1933, 67 F.2d 1014; The Vulcan, D.C.E.D.La.1945, 60 F.Supp. 158, 162. Such an inference is even stronger in a case like this, wherein no expert testimony was offered as to the condition or adequacy of the lines. In the instant case the inference to be drawn is that the starboard stern line of Central Carfloat No. 66 was latently defective, or otherwise inadequate to its task. In the absence of any adequate and credible evidence as to the sufficiency of the lines, or any explanation as to the failure of Central to produce the lines in court after request, I must conclude that Central has not established its freedom from responsibility for the accident. That the lines were inadequate to their task is the most logical explanation for their parting. The failure to produce them not only creates the presumption that such production would be adverse to Central's interests on that key question, but renders it impossible for the other interested parties conclusively to show that inadequacy. Moreover, the failure to produce may not be explained as an oversight occasioned by failure to recognize their importance, for Central was aware that the lines had parted and that an accident had occurred within minutes after it took place.

■ Faced with its failure of proof Central has recourse to one final argument. It contends that even if the line were defective, Long Island, as owner of the dock, had an affirmative duty to assure that all vessels there docked were adequately moored. It appears, however, that the Long Island never entered into any contractual obligation to assume such a duty. If such a duty existed, it would arise only out of Long Island's status as bailee. However, John T. Farrell, Assistant Freight Manager in charge of Marine Operations for Long Island testified without contradiction that no charge was made for use of the Pine Dock. Under such circumstances Long Island was at most a gratuitous bailee. But, even if the distinctions among types of bailees are dropped, Long Island's duty extended only to taking ordinary care under all the circumstances. See, e. g. Exner Sand & Gravel Corp. v. Swenson, D.C.E.D.N.Y. 1953, 110 F.Supp. 531, 536, affirmed 2 Cir. 1954, 212 F.2d 205. That duty would not be violated by a failure to inspect all lines for latent defects. Such a duty would approach absolute liability.

■ Upon a consideration of all the evidence, and after having heard the witnesses in open court, I conclude that Central has not sustained its burden against either Long Island or Lehigh, and that its negligence was responsible for the accident.

■ As a further complete bar to any decree against itself, Lehigh has also raised the defense of laches. It is conceded that Lehigh did not get notice of the collision or of its possible involvement until the impleading petition was served upon it in February of 1958, over four years after the accident. Furthermore, it did not have the opportunity to attend the damage survey. On the other hand, it is clear that Central had notice of the accident on the day it occurred and by a simple check of records could have discovered the "drilling out" of Lehigh's Carfloat No. 1703. Laches is an equitable defense and depends on considerations of fairness. But, the rule has developed that the court will look to the state statute of limitations as an analogy, and if the action were not commenced within that time the burden will be on the party against whom laches is raised both to justify the delay and establish that the other party was not prejudiced thereby. See Redman v. United States, 2 Cir., 1949, 176 F.2d 713; Schiavone-Bonomo Corp. v. Buffalo Barge Towing Corp., 2 Cir., 1945, 132 F.2d 766; Brown v. Kayler, 9 Cir., 1959, 273 F.2d 588, 589; Evans v. American Export Lines, Inc., D.C.S.D.N.Y.1959, 175 F.Supp. 386. The

only excuse tendered by Central for failing to contact Lehigh earlier is that it was not notified of Lehigh's possible involvement in the accident by Long Island. This excuse is without substance. There is no duty on a claimant to tell one possible tortfeasor that others might possibly exist.

To this defense Central responds that since its claim against Lehigh is in the nature of indemnity, it did not arise until an action had been commenced against it by Long Island. See Moran Transportation Corp. v. Lehigh Valley R. R., D.C.S.D.N.Y.1954, 126 F.Supp. 122, 1955 A.M.C. 311; James McWilliams Blue Line, Inc. v. Esso Standard Oil Co., D.C.S.D.N.Y.1954, 123 F.Supp. 824, 1954 A.M.C. 1134; Shamrock Towing Co. v. Pennsylvania R. R., D.C.S.D.N.Y.1948, 84 F.Supp. 402, 1949 A.M.C. 280. Thus, Central contends, its impleader petition was almost two years within the applicable New York statute of limitations, Civil Practice Act, § 50. But, in the view I take of this case, it is unnecessary to decide when the statute of limitations would begin to run on non-contractual indemnity. In raising this point Central has lost sight of the fact that laches is an equitable defense and the state statute is resorted to only as an analogy. While absent explanation the action will be dismissed if brought after the statute has run, it does not follow that the action must be allowed if, for some technical reason, the statute has not run. Even if I assume for purposes of this decision, therefore, that the impleader petition was technically within the statute, considerations of fairness would impel me to hold that laches bars the claim against Lehigh. The question is not of technical compliance, but whether through fault of Central, Lehigh was prejudiced unduly in defending itself against liability.[1] In this case, where Central had prompt notice of the accident and could quickly and easily have discovered Lehigh's alleged role, a delay of over four years cannot be justified by recourse to technicalities.

Long Island and Central have stipulated that repairs to the Tug Patchogue after the accident totalled the sum of $7,781.

The Long Island Railroad is entitled to a decree against the New York Central Railroad and New York Central Railroad Carfloats Nos. 66 and 25,[2] together with

---

1. There is no doubt that Lehigh's defense was rendered almost impossible by the delay. Though Lehigh presented those who had taken part in the "drilling out" more than four years earlier, they were unable to remember anything about the event, and could only testify as to their general practice. Thus, because of the delay Lehigh was denied any direct testimony that might negative the allegations of negligent mooring. True, the witnesses speculated that they would most likely not have remembered the "drilling out" for very long in any event. But, as Judge Hand put it:

"The most that libellant has shown is that some two years after the event respondent's employees, who were possible witnesses, had flagging memories of what occurred. That should hardly surprise anyone, and were it taken as sufficient to negative any detriment to United Fruit Company it would be simple indeed to avoid the bar of the statute. In our opinion the fact that libellant's delay had already begun to operate on the memory of respondent's potential witnesses before the statute had run does not justify overlooking his delay in asserting his claim past the period of the statute." Redman v. United Fruit Co., 2 Cir., 1950, 185 F.2d 553, 554.

Perhaps the result would be different were this a case in which Lehigh would be expected to know of its involvement, as would be the case were a Lehigh vessel involved in the collision. But, absent reasonably prompt notice Lehigh in this case would make no effort to investigate or perpetuate testimony, and in fact did not do so.

2. Long Island maintained throughout that even if Central were in no way negligent, but Lehigh had been responsible, Long Island nevertheless is entitled to a decree *in rem* aganist Carfloats Nos. 66 and 25. This theory is based upon the proposition that a vessel is a juridical entity and must respond for all harms caused by it, without regard to the owner's fault. For this proposition there is impressive authority. See, e. g. The Barnstable, 1901, 181 U.S. 464, 467, 21

interest from the date of the disbursement and costs. See Tanker Hygrade No. 24, Inc. v. Tug Dynamic, 2 Cir., 1956, 233 F.2d 444, 1956 A.M.C. 1032, 1036–1037.

The Lehigh Valley Railroad is entitled to a decree dismissing the impleading petition.

The foregoing opinion shall constitute my findings of fact and conclusions of law.

S.Ct. 684, 45 L.Ed. 954; The China, 1868, 7 Wall. 53, 74 U.S. 53, 19 L.Ed. 67; The Helen, 2 Cir., 1924, 5 F.2d 54. In the more recent cases, however, there has been a tendency to limit and question this theory of absolute *in rem* liability. Compare Burns Bros. v. Central R. R. of New Jersey, 2 Cir., 1953, 202 F.2d 910, 912–913 with Oil Transfer Corp. v. Westchester Ferry Corp., D.C. S.D.N.Y.1958, 173 F.Supp. 637 (both per L. Hand, J.).

In an event, since I have found that Central's own conduct has rendered it liable here, the decision on this additional point is unnecessary, and thus I shall not gratuitously pass upon it.