## WILSON *v.* SIBLEY *et al.*

### (*District Court, S. D. Alabama.* October 17, 1888.)

**1. TOWAGE—NEGLIGENCE.**

Defendant was employed to tow a raft of logs from a creek through Mobile bay up to the city; a trip which usually takes 12 hours, but which in this case took more than 50, in consequence of the slow progress made by the small tug which towed it out of the creek into the bay, the delay in sending a larger tug to meet it, and the loss of time occasioned by a collision with the shore of the creek, and by the breaking of the tow-line. The raft was tied up during the intervening nights, one night in the creek and the other anchored, but unattended, in the bay. *Held*, that these accidents and delays must be deemed to have caused the loss of the logs from the raft, if that was seaworthy when taken in tow.

**2. SAME.**

Defendant had agreed, as is the custom, to send a small tug to take the raft from the creek into the bay, where the larger tug was to meet the tow and take it up to the city. Much time was lost in sending the larger tug, the only reason given for the delay being that defendant did not know where the tow was. *Held*, that the delay was a want of due care.

**3. SAME.**

Though the evidence to show that the collision of the raft with the shore was caused by having too much tow-line, rendering the tow unmanageable by the tug, is not very clear, in the absence of satisfactory explanation of the cause, negligence will be presumed.

**4. SAME.**

Turning on too much steam, so as to cause a tug to start with such speed, and so sudden a jerk, as to wrench the tow-line, is a want of reasonable care and skill.

**5. SAME—SEAWORTHINESS OF RAFT.**

The evidence that the raft was put together in manner customary for such voyages was uncontradicted, but defendant, to show that it was unseaworthy, relied on the opinion of experts, on the facts that logs were lost from it, and that a raft fastened in the manner indicated by the cutting and boring on a piece of log shown in court would be unseaworthy. There was no evidence that any of the other logs were cut and bored like this one, and the evidence of libelant was that they were not. *Held,* that the raft was in a seaworthy condition when taken in tow.

**6. SAME.**

Even if the raft was unseaworthy by reason of its defective construction, that was an obvious defect, and it was negligence to undertake the trip; and, as the loss occurred from extraordinary hazards arising from defendant's failure to use due care and skill, libelant is entitled to a decree for the value of the logs lost.

In Admiralty. Libel by E. L. Wilson against Sibley & Sibley.

*G. L. & H. T. Smith,* for libelant.

*Pillans, Torrey & Hanaw,* for defendants.

TOULMIN, J. This is a libel, brought by the owner of a raft of about 400 logs to recover the value of a part of them, alleged to have been lost through the negligence of the owners and officers of the steam-tugs which undertook to tow the raft from Bay Minette creek to the city of Mobile. Libelant claims that the raft was constructed in the customary way of rafting logs to be towed over the voyage this raft was to make, and that it was sufficiently strong and seaworthy for the purpose of such navigation. The defendants deny negligence on their part, and charge that the loss was occasioned wholly by the unseaworthy condition of the raft; that it was badly constructed, and not sufficiently strong and staunch to withstand the ordinary perils to be encountered upon the voyage. It is not claimed, and the evidence does not show, that any extraordinary perils from wind and weather were encountered upon the voyage. The testimony on the part of the libelant is that the raft was put together in the customary way of rafting logs to be towed over the voyage this raft was to make, and this was uncontradicted. The testimony on his side further is that the raft was in good condition and seaworthy, and libelant so represented it to defendants when the contract for the towage was made. But the masters of the three several tugs that had at different times during the voyage participated in the towing of the raft testify that it was badly put together. One of them (the master of the last tug which took part in the towage, and which was on the third day of the voyage) testifies it was the worst raft of logs he ever saw, and that, if he had been called on to take it in tow in the first instance, he would have refused to do so, because, in his opinion, it was not seaworthy. The evidence tends to

show that it was usual for the master of a tug taking a raft in tow to examine it, to see if it is in a proper condition to be towed. In this instance it was not specially examined by the master of the first tug that took it. The evidence also shows that the owner of the raft did not accompany it, either personally or by agent, and was not present when it was taken, or notified that it would be taken at the particular time. It further appears that the contract between libelant and defendants was that defendants would send for the raft as early as convenient, or when, in their judgment, the stage of the water in the river justified the undertaking. And it seems to have been understood that a small tug was to be sent to tow the raft out of Bay Minette creek into Mobile bay, where a larger and more powerful tug was to meet the tow and bring it up to the city of Mobile, and it appears that this was the usual course. It further appears that it generally took about 12 hours to make the trip with a tow such as this was. In this instance more than 50 hours were consumed; but the raft was tied up during the two intervening nights, —one night before getting into Mobile bay, and the other night it was left anchored, but unattended, in the bay. The chief cause of the delay in making the voyage seems to have been because of the slow progress made by the small tug which brought the raft out of Bay Minette creek, and the delay in sending a more powerful tug to take the tow from her. In view of the understanding between the parties, and of the usual course in towing rafts from the same locality, the delay in sending such larger tug is not satisfactorily accounted for. The reason given by one of the defendants, that he "did not know where the tow was," does not, in view of the evidence, excuse the delay. There was much time lost in sending the larger tug to meet the tow, and after it was sent more time was lost in the breaking of the tow-line, caused, as it appears, by the improper or unskillful conduct of her engineer, who was drunk. It also appears from the evidence that the raft while in tow by the first tug, before getting out of Bay Minette creek, was run aground or upon the shore, and must have been somewhat injured, as a natural result of a collision with the shore of so large a raft, and as appears from the fact that one of the logs was lost there. This must have resulted from want of sufficient power in the tug to control the raft, or from unskillful management of the tow. There is some evidence (not very clear, it is true) which tends to show that this accident was caused by having too much tow-line, which rendered the raft unmanageable by the tug. There being, however, no satisfactory explanation of the cause of the accident, nothing to show that it was unavoidable by the exercise of reasonable skill and care, negligence will be presumed. *The Quickstep,* 9 Wall. 665; *The Cummings,* 18 Fed. Rep. 181; *The Delaware,* 12 Fed. Rep. 571; *The Seven Sons,* 29 Fed. Rep. 543.

I think, upon the evidence, it is reasonable to suppose that the injury and loss complained of were occasioned by the collision of the raft with the shore in Bay Minette, its long exposure to the wind and waves in its slow passage in and across Mobile bay, and by being anchored for so long a time in the open bay, waiting to be towed up the channel to the city

of Mobile, which caused the logs to be chafed and worn by the chains with which they were fastened together, and rendered them liable to be broken loose by the ordinary action of the wind and water.    There is no other adequate cause shown or suggested for the breaking of the raft and loss of the logs therefrom, assuming that the raft was seaworthy when it was first taken in tow.    But it is strenuously urged on part of the defense that the raft was not seaworthy.    On the evidence in the case there is no question that it was put together in the customary way of rafting logs to be towed over the voyage this raft was to make.    But there is some conflict of opinion as to whether it was in a seaworthy condition; that is, in "such condition of strength and soundness as to resist the ordinary action of the sea, wind, and waves during the contemplated voyage."    The evidence relied on by the defendants to establish the unseaworthiness of the raft, and that the loss was attributable thereto, is the opinion of expert witnesses, masters of tug-boats,—who as such had had some experience in towing rafts,—the fact that logs had been lost from this raft, and the exhibition in court of a small piece of the end of a log claimed to have been the first log lost from the raft in question, and showing the manner in which it was cut and bored for the reception of the chain with which the raft was fastened together.    There was some conflict of evidence as to whether this log was one of the logs lost from this raft.    But I am inclined to believe from the evidence that it was; and, independent of any expert or other testimony on the subject, I would say that a raft of logs fastened together as indicated by the log exhibited would not be seaworthy for a voyage contemplated by the raft in question.    But there was no proof on the part of the defendants that any of the other logs in the raft were cut and bored like this one, and the evidence for the libelant was that they were not.    I therefore find from a preponderance of the evidence that the raft was in a seaworthy condition when it was taken in tow, and that the cause of the loss was due to circumstances which subsequently occurred, and which were attributable to a want of proper care on the part of the owners of the tugs, and of their agents who were in charge of them.

Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault.    But there are cases in which the result is a safe criterion by which to judge of the character of the act which has caused it.    *The Webb*, 14 Wall. 406. My opinion upon the whole evidence is that the delay in sending the larger tug to meet the tow, thus causing an unusual exposure of the raft to danger, was a want of due care on the part of the defendants; that the collision with the bank of Bay Minette was a want of due care in the handling of the tow; and that the action of the engineer in turning on too much steam, and causing the tug to start with so much speed, and so sudden a jerk or wrench as to part the tow-line, was a want of reasonable skill and care; all of which, it seems to me, must have combined to produce the loss complained of, in the absence of satisfactory proof of the unseaworthiness of the raft.    But if the raft was in an unseaworthy condition by reason of its defective construction, as is claimed, it was an ob-

vious defect. And it is held that owners of tugs are chargeable with negligence in undertaking a tow upon a trip for which its unfitness is obvious. *The Wm. Murtaugh,* 3 Fed. Rep. 404; *The Wm. Cox,* 9 Fed. Rep. 672; *Connolly* v. *Ross,* 11 Fed. Rep. 342. If the loss occurs in the ordinary contingencies of the voyage, to which the unfitness contributed, public policy requires that both tug and tow should be held to be in fault. And so here, if the raft was in a condition obviously unfit to encounter the known hazards of the voyage, the rule that both should be held in fault would be applied. But I have found from the evidence that the loss here complained of occurred from extraordinary contingencies, or hazards resulting from defendants' failure to use due care and skill, and best endeavors in performing the service, as required by their engagement. News. Salv. 141, 144. A decree will be entered for libelant for $132.18, being the value of the logs lost, less $15, the balance of the towage charges due to defendants by the libelant, which is claimed as a set-off in this case.