SHAMROCK TOWING CO., Inc., Libelant,

v.

SCHIAVONE–BONOMO CORP., Respondent, and Apex Salvage Corporation and Russell Bros. Towing Co., Inc., Respondents-Impleaded.

WILLIAM J. McCORMACK SAND DIVISION, PENN INDUSTRIES, INC., Libelant,

v.

SHAMROCK TOWING CO., Inc., Respondent, Schiavone-Bonomo Corp., Russell Bros. Towing Co., Inc. and Apex Salvage Corporation, Respondents-Impleaded.

SCHIAVONE–BONOMO CORP., Libelant,

v.

THE SHAMROCK NO. 80, THE J. RAYMOND RUSSELL and Apex Salvage Corporation, Respondents.

United States District Court S. D. New York. May 11, 1959.

Foley & Martin, New York City, Christopher E. Heckman, New York City, of counsel, for Shamrock Towing Co., Inc.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, George B. Warburton, Henry C. Eidenbach, New York City, of counsel, for Schiavone-Bonomo Corp.

Mahar & Mason, New York City, Frank C. Mason, New York City, of counsel, for Russell Bros. Towing Co., Inc.

Cooper, Ostrin & DeVarco, New York City, Richard Gyory, New York City, of counsel, for Apex Salvage Corp.

Platow & Lyon, New York City, E. F. Platow, New York City, of counsel, for William J. McCormack Sand Division, Penn Industries, Inc.

DAWSON, District Judge.

These are three actions in admiralty which were consolidated for purposes of trial and which arose out of the careening of the deck scow Shamrock 80 in the East River, near Stakeboat No. 2 adjacent to Rikers Island, on March 18, 1957, while in tow of a tug and while carrying a cargo of scrap iron. Recovery is sought for (1) the loss of the cargo of scrap iron, (2) damages to the scow Shamrock 80 and (3) damages as a result of the expense of clearing the fouled approaches to Stakeboat No. 2.

Shamrock Towing Co., Inc. and Schiavone-Bonomo Corp. were respectively the owner and charterer of the scow Shamrock 80.

Apex Salvage Corporation sold the scrap iron to Schiavone-Bonomo Corp. and also loaded it aboard the scow.

Russell Bros. Towing Co., Inc., was the owner of the tug J. Raymond Russell which had the scow in tow at the time of the careening.

William J. McCormack Sand Division, Penn Industries was the owner of Stakeboat No. 2.

### Facts

The Shamrock 80 was a typical wooden harbor deck scow of approximately 113 feet in length, 33 feet in width and 8.7 feet in depth.

A contract had been entered into on January 10, 1957, between Schiavone-Bonomo Corp. and Apex Salvage Corporation, for the purchase by the former of one scow load of approximately 500 gross tons of No. 2 heavy melting steel, to be delivered f. o. b. and to be loaded, stowed and trimmed aboard a scow at the dock of Apex Salvage Corporation in the Bronx River. This cargo was loose, rather than bundled, scrap iron consisting of cut up automobile parts somewhat greasy in nature.

Loading of the scow Shamrock 80 was begun on March 11, 1957, and was performed by the use of a movable crane and magnet operated by employees of Apex Salvage Corporation. On Friday, March 15th, the captain of the scow Shamrock 80, who was supplied by the scow owner Shamrock Towing Co., Inc. protested the manned in which the cargo had been loaded on the starboard side near the bow. This information was transmitted to Schiavone-Bonomo Corp., whereupon Mr. Moscowitz of Schiavone telephoned Mr. Bassow, President of Apex Salvage Corporation and advised Mr. Bassow that the scow was not being loaded properly. While there is some conflict in the testimony concerning these matters, it appears that Mr. Bassow thereupon assured Mr. Moscowitz that Apex knew how to load scows and that the load was "all right." On the following day, employees of Apex Salvage Corporation, by use of the crane, swung the magnet, weighing 4,000 pounds, against the side of the load so as to drive the part of the cargo which was over the starboard railing toward the center of the scow.

About noon on March 18th a representative of B. W. King, Inc., visited the Shamrock 80 at the Apex plant to determine the weight of the cargo by taking water displacement measurements of the scow. Such measurements required the inspector to ascertain the quantity of water, if any, below deck in the Shamrock 80, and his inspection showed a minimum quantity of water, such as is found in most wooden scows. At that time the scrap aboard the Shamrock 80 was stowed to a height of between 15 and 20 feet above the deck and the B. W. King Co. measurer advised the President of Apex that the vessel was top heavy as a result of the method of stowage and observed that the cargo was stowed as high as he had ever seen on a scow of this type.

Later calculations showed that the cargo weighed approximately 615 gross tons. Since the President of Shamrock testified that during the prior year the Shamrock 80 had carried loads in excess of 700 tons, but of lesser bulk than the cargo involved in this litigation, it does not appear that the scow was overloaded. The question is not of the load on the scow

but rather the height and stow of the cargo.

After the scow Shamrock 80 had been measured for the weight of the cargo, the scow was taken in tow by the tug Russell 9 shortly after noon on March 18, 1957, and towed approximately 1¾ miles to the McCormack Stakeboat No. 2 in the East River, where the scow remained until the tug J. Raymond Russell arrived to tow the Shamrock 80 to its destination at Jersey City.

The tug J. Raymond Russell, which had the barge D. L. & W. No. 155 in tow alongside, came up from astern of the Shamrock 80, so that a breast line could be secured from the bow of the Shamrock 80 to the bow of the D. L. & W. No. 155. At this time the captain of the tug J. Raymond Russell observed that the scow Shamrock 80 was listing at least four, and possibly six inches to its port side. The tug J. Raymond Russell then backed clear and proceeded ahead of the two scows, first placing a towing hawser on the starboard bow corner of the D. L. & W. No. 155 and then placing another hawser to the port bow corner of the Shamrock 80. After the tow had been made fast and the line from the scow Shamrock 80 to the stakeboat let go, the tug J. Raymond Russell started to get under way at slow speed. As the tug J. Raymond Russell began to turn to its own port, the deckhand reported that the scow Shamrock 80 seemed to be in difficulty and, although the captain of the tug J. Raymond Russell immediately straightened up the tug, the list of the Shamrock 80 continued until she careened and dumped her cargo over the port side.

The captain of the tug J. Raymond Russell stated he would not have taken the scow in tow if there were water in her, since the water sloshing from side to side would sharply affect the stability of the scow. The tug captain relied on the scow captain's statements that there was no water in the scow. Although neither tug captain had any fear of towing the scow if it contained no water, both the captain of the tug Russell 9

and the captain of the tug J. Raymond Russell also testified that the load on the Shamrock 80 was just about the highest load they had ever seen.

As a result of the dumping, the scow Shamrock 80 was damaged, some of the cargo owned by Schiavone-Bonomo was lost and the area surrounding the Stakeboat No. 2 and its approaches became a hazard to navigation, necessitating salvage operations to remove the mound of scrap iron.

The questions presented by these actions are whether the damage was occasioned by (1) the unseaworthy condition of the scow, (2) the improper loading of the scow, (3) the improper towing or care by the tug, or (4) a combination of any of the foregoing.

## Discussion

From the testimony it appears that the deck scow had taken on only a minimum amount of water and the burden of proving that she was in a good, seaworthy condition just prior to the accident, was fully satisfied by the owner. The Cullen No. 32, 2 Cir., 1932, 62 F.2d 68, affirmed 1933, 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189.

Although the scow was not overloaded, it was loaded extremely high and in a top heavy condition. Due to the nature and condition of the cargo and the circumstances surrounding the loading operation the Court finds that the scrap iron was negligently loaded and stowed aboard the Shamrock 80 and that this improper loading was the proximate cause of the accident and resultant damage.

A party who undertakes the responsibility of loading a scow is liable for the damage caused by the negligent loading of the scow. The Frederick W. Starr No. 25, D.C.E.D.N.Y.1930, 41 F. 2d 528. Here the responsibility for the loading of the scow was, by contract, placed directly with Apex Salvage Corporation. It also appears that since the amount of the sale of the scrap iron by Apex to Schiavone depended on the weight, it was to the financial interest of

Apex to load as great a quantity of scrap on the scow as possible. Furthermore, the Court finds that the entire loading operation was under the supervision and direction of the employees of Apex.

The contention by Apex that the scow captain directed the loading and that the Apex employees were merely following the scow captain's instructions, is without merit. In any event, a scow captain is not responsible for telling stevedores how they should properly load and stow cargo. Hastorf Contracting Co. v. Ocean Transp. Corp., D.C.S.D.N.Y. 1923, 4 F.2d 583, affirmed 2 Cir., 1924, 4 F.2d 584. In that case Judge Learned Hand pointed out that while a barge captain would be responsible for "stopping the load at the barge's capacity, and other matters fairly within the competence of the ignorant men who man such craft," it would be unreasonable to expect him to instruct stevedores on a subject that he may assume they already know. In the instant case, the scow was not loaded beyond its capacity; it was improperly loaded. This was a matter fairly within the knowledge and responsibility of those who undertook to load the scow.

Although the employees of Apex were not actually stevedores, there was testimony that Apex had been loading scows for a considerable number of years and was therefore experienced and trained in these matters. Under these circumstances, there is no reason to relieve them of the duty imposed on stevedores generally to load and stow cargo properly. Red Star Barge Line v. Luria Bros. & Co., D.C.S.D.N.Y.1953, 116 F.Supp. 656. In that case a cargo of steel scrap was purchased from the United States of America which, under its contract of sale, was obligated to load the scrap on the scow at the New York Naval Shipyard. The action was for damage to the scow as a result of the negligent loading of the scow in concentrating the load rather than spreading it evenly across the deck. Under the circumstances Judge Kaufman held that the barge captain was not charged with the loading operation and had no obligation to protest or to direct the riggers on the distribution of the cargo. Apex Salvage Company is then clearly primarily liable for the damages flowing from its negligent loading of the scow.

We come now to a consideration of the liability of Russell Bros., as owners of the tug, that had the scow in tow at the time of the careening.

The responsibility of a tug is not that of a common carrier, nor is it an insurer; however, it is bound to exercise ordinary care and display dependable seamanship in handling a tow. Dameron-White Co. v. Angola Transfer Co., 5 Cir., 1927, 19 F.2d 12. The question then arises as to whether the captain of the tug J. Raymond Russell exercised ordinary care under these circumstances.

"The happening of an accident to a tow does not of itself raise any presumption of negligence on the part of the tug; and the burden of proof is upon the party seeking to charge the tug with liability therefor. The towage contract requires no more than that one who undertakes the service shall carry out his undertaking with the degree of caution and skill which prudent navigators usually employ in similar services." Southgate v. Eastern Transp. Co., 4 Cir., 1927, 21 F.2d 47, 49.

From the facts stated heretofore the Court finds that the care rendered to the tow by the tug was reasonable. The only question which arises is whether the high loading condition, as observed by the tug captains, was such a disclosure as to put them on notice that it would be negligent for them to attempt to proceed with the tow at all. Dameron-White Co. v. Angola Transfer Co., 5 Cir., 1927, 19 F.2d 12; Wilson v. Sibley, D.C. S.D.Ala.1888, 36 F. 379. It appears that the careening of the scow and the spilling of the load was a result of a combination of factors. In addition to the height of the load, other contributing factors were the top heavy condition of the load, the greasy nature of the cargo, the manner of stowing the scrap iron, the interlacing

of the individual pieces of scrap iron and the manner in which the starboard bulge had been corrected. All these contributing factors were within the knowledge of the loaders, but not known by the tug captains. The Court finds therefore that the condition of the scow in its then loaded condition was not so obviously unfit for towing as to put the tug captains on notice that it would be negligent to proceed with the tow.

Schiavone-Bonomo, the charterer of the scow, was a bailee and even though the damage is not the result of its own negligence a charterer is secondarily liable for damages to a vessel during the charter period. Roah Hook Brick Co. v. Erie R. Co., 2 Cir., 1950, 179 F.2d 601. The owner of a scow is entitled to a decree for damages against the charterer, and the charterer is entitled to a decree over against a stevedoring company where the damage was caused by the negligence of the stevedoring company. The Jerry v. Petrie, D.C.E.D. N.Y.1946, 65 F.Supp. 491. Therefore Schiavone-Bonomo, although not negligent, is secondarily liable for the damages flowing from the accident.

It has been stipulated by all the parties that McCormack, the owner of the stakeboat, was obliged to and did remove approximately 110 tons of scrap iron which was lost from the deck of the scow and which fouled the approaches to Stakeboat No. 2. Therefore, libelant McCormack is entitled to a decree against Apex Salvage Corporation for its damages, with interest and costs. The libel against the remaining respondents and respondents-impleaded in this action is dismissed with costs.

Libelant Shamrock Towing Co., Inc., is entitled to a decree against Apex Salvage Corporation primarily and Schiavone-Bonomo Corp. secondarily, for its damages, with interest and costs. The petition of Schiavone-Bonomo Corp. impleading Russell Bros. Towing Co., Inc., is dismissed with costs.

Schiavone-Bonomo Corp. is entitled to a decree against Apex Salvage Corpora-

tion for its damages, with interest and costs, and the libel against the scow Shamrock 80 and the tug J. Raymond Russell is dismissed with costs. Zeller Marine Corporation, the broker in the charter of the scow, was also a respondent in the libel by Schiavone-Bonomo Corporation and has defaulted in appearing. However, since there has been no testimony indicating any liability on its part, the action as to Zeller Marine Corporation is dismissed.

This opinion shall constitute the findings of fact and conclusions of law of the Court. Upon application, reference will be made to a Commissioner for determination of the amount of the damages.

Submit decree within 15 days from the date of this opinion.