**CHARLES J. KING, INC., Plaintiff,**

v.

**UNITED STATES FIDELITY AND GUARANTEE COMPANY, BALTI-MORE, MARYLAND, Orion Insurance Co., Ltd., London & Overseas Insurance Co., Ltd., Members and Subscribing Underwriters of the Institute of London Underwriters Lloyd's London and the Subscribing Underwriters in Syndicates Numbered 933, 418, 108, 335, 764, 239, 450, 999, 213, 203, 66, 299, 185, 632, 633, 368 and 304, Members of Lloyd's London, Defendants.**

No. 64 Civ. 431.

United States District Court
S. D. New York.

March 1, 1967.

Alexander, Ash & Schwartz, New York City, for defendant United States Fidelity & Guarantee Co. (Sidney A. Schwartz, New York City, of counsel).

Symmers, Fish & Warner, New York City, for defendant Orion Ins. Co., Ltd., and others (William Warner, New York City, of counsel).

RYAN, District Judge.

Three actions were before the Court for trial—two of them, filed as Libels in Admiralty 62 AD 138 and 62 AD 813, were consolidated and tried together first by the Court, for the decision reached in them would determine whether a trial of the third action (64 Civil 431) was necessary. We rendered our decision on the first two libels (and have since made formally stated findings) and proceeded to try the third Action (64 Civil 431), upon which we now file our decision.

The facts underlying the litigation are as follows:

In Libel 62 AD 138, Zeller Marine Equipment, Inc., as owner of the scow Zeller No. 50, sued Schiavone-Bonomo Corporation to recover for damages to the scow which it had chartered on August 18, 1961, to Schiavone-Bonomo and which was returned in a damaged condition on December 8, 1961. It was not disputed that the scow suffered damage when on December 8, 1961, she careened and dumped her cargo at the berth of Charles J. King, Inc. King and Schiavone-Bonomo had on November 21, 1961 entered into a scrap steel sales agreement under which King, the seller, was to load f. o. b., stow and trim the cargo on a scow to be delivered at its dock.

Schiavone-Bonomo pleaded in defense that the scow was unseaworthy and under the control of Zeller (who had supplied the bargee) and that any damage to her was caused not by Schiavone-Bonomo's negligence but by acts of persons over whom it had no control. Then, to protect itself against an adverse finding on its defense of unseaworthiness, Schiavone-Bonomo impleaded King as a Respondent and as the one it alleged to be responsible for the damage by reason of improper loading because, under their sales agreement, it was King's obligation to load and it did load with its own personnel.

Schiavone-Bonomo, as owner of the cargo, also filed a separate libel (62 AD 813) against King for loss of and damage to its cargo. King defended, pleading that the scow had been loaded and trimmed to the satisfaction of the scow bargee—a Zeller employee—at which point King's responsibility ended, that it was ignorant of the cause for the scow's capsizing and entirely free from fault. King cross-claimed against Schiavone-Bonomo for indemnity, asserting breach of an insurance agreement between them, in the event that it is determined that Schiavone-Bonomo had not performed the alleged insurance agreement.

It is not disputed that prior to December 8, 1961 Schiavone-Bonomo and Charles J. King, Inc., had entered into an agreement under which Schiavone-Bonomo agreed to obtain insurance under which King would be a named assured. Insurance was obtained and King was named as an assured, subject to the terms of the policies, "while acting as agent, stevedore or in any other capacity" of the assured Schiavone-Bonomo.

Following the trial of these libels (62 AD 138 and 62 AD 813), we found and concluded that Zeller was entitled to recover from Schiavone-Bonomo as the charterer for the damage to the scow, because the damage was the result of improper loading by King; that Schiavone-Bonomo was entitled to recover over from King for the amount it would have to pay Zeller for damage to its scow; that in addition Schiavone-Bonomo was entitled to recover from King for loss and salvage of its cargo. This conclusion was, however, subject to off-set by King on King's insurance claim against Schiavone-Bonomo. In sum, we

concluded that Schiavone-Bonomo was entitled to recover over against King for damages it had to pay Zeller, as well as for its own cargo damage; this was an absolute liability of King unless it was later judicially found that the insurance agreed to be taken out by Schiavone-Bonomo to cover King did not cover King, a question which was to be answered in the trial of action 64 Civil 431.

In this suit (64 Civil 431), King as plaintiff seeks a declaratory judgment against United States Fidelity and Guarantee, Orion Insurance Company, Ltd., Edinburgh Insurance Co., Ltd., and their British underwriters, declaring that it is covered for the losses incurred in the Admiralty suits above described under three policies: Policy No. CGL 280363, Comprehensive General Liability Policy, issued to it by United States Fidelity and Guarantee on November 13, 1961; two Third Party Legal Liability Policies: #117058 issued on December 13, 1960 by the Institute of London Underwriters and #53063 issued on January 3, 1961 by Lloyd's London, to Schiavone-Bonomo in which King is named as an additional insured.

No claim is made by any of the parties that the policies are ambiguous and all agree that King appears as a named insured.

It was stipulated that the record and exhibits in the two related Admiralty actions, as well as other evidence introduced by the parties on the trial of this third action, would constitute the trial record for determination by the Court whether or not the losses as established in the Admiralty actions were covered under the policies.

United States Fidelity and Guarantee's defense rests on two exclusions to the coverage to property damage which exclude coverage for "injury to or destruction of property in the care, custody or control of the Insured or property as to which the insured for any purpose is exercising physical control　＊　＊　＊ "and "injury to or destruction of　＊　＊　＊ work completed by or for the named insured, out of which the accident arises,"

and it pleads that the insured King had control of the scow and cargo and that it had completed the loading when she capsized.

The defense of the London and Lloyd's underwriters on their two policies, which are identical in that they cover Schiavone-Bonomo against liability imposed by law or damage arising from the use and operation of scows and unrigged vessels employed in their business of shipping scrap iron and steel, is found in paragraph "6" of the policy which reads: "This policy also covers the interest of the below listed firms (except to the extent of any other valid and collectible insurance) while acting as agents, stevedores, or in any other capacity of the insured; Charles J. King Scrap Iron & Steel Corporation"—a clause which excludes, they say, the losses here because King was "acting in its own behalf" and because it was covered for these losses by United States Fidelity and Guarantee.

The policies are trial exhibits in the record before the Court; they contain the exclusions alleged; there remains to be determined whether on the facts established in the Admiralty actions the losses to King fall within one or both policies.

We consider first whether as alleged by United States Fidelity and Guarantee, King is excluded from coverage because the loading was completed by it prior to the capsizing and loss. In support of this, United States Fidelity and Guarantee read into evidence the allegations of King in its answer in 62 AD 138 that the loading was completed to the satisfaction of the bargee on December 8, 1961 at 2 P.M. on the day in question and that, following the completion of the loading, Schiavone-Bonomo was advised of this in order to tow the scow away. This is certainly the claim of King—in fact it relied on the trial on the execution by the bargee Joyce between 2 and 4:30 P.M. on December 8, 1961 of a receipt for the 850 tons of scrap loaded and trimmed in the scow, and submitted this as proposed findings. The cargo, King also pleaded and proposed as a finding of fact, did

not start to shift and fall off the starboard side until 7:30 in the evening, at which time the loading was completed, and that the scow did not capsize with resultant damages until 9 P.M.

We have found that the loading of the scow was completed not at 2 P.M. but sometime between 2 and 4:30 P.M., but no later than 5 P.M. and after the bargee Joyce executed a receipt for 850 tons of scrap; that when he executed this receipt, the initial loading of the 850 tons had been made but that King's derrick remained there and continued rearranging and trimming the cargo until but not later than 5 P.M., in an effort to shift some of the weight and correct a starboard list which had developed during the loading. In support of this, we have the undisputed testimony that the bargee Joyce signed a receipt for 850 tons at about 4 P.M. when he was told by King that was all that "they were going to load;" that upon his return from the office, he saw the derrick lifting cargo from the dock to the scow and rearranging cargo on the scow; that all operations by King's employees were completed at 5 o'clock when they all went home, including King, and that he, Joyce, stayed aboard because the scow had been ordered to be towed that night.

We observed on trial, subject to more explicit findings later to be formally made, that although King had stated that its work of loading had been completed, and the bargee Joyce had acted upon the statement that this had been done, in fact the loading and trimming had never been fully and properly performed and the cargo of scrap had never been properly stowed.

We have considered also on this issue the testimony by deposition of Charles J. King, Sr., who personally supervised the loading, that the loading was completed by 2:30 P.M., that he notified Schiavone-Bonomo that the scow was then ready for towage, that he noted the time in order to have the crane operator do other work, that he left between 4:30 and 5 P.M. quitting time for all, and did not return until later that evening when called by Zeller who informed him that the scow was sinking.

We have considered, too, the testimony of the crane operator who testified that he completed the loading at approximately 2:30 P.M. when King told him that was all that was going to be put on; that he did other work around the yard until 5 P.M., which was quitting time; that when he returned that evening after receiving a telephone call from King, the scow was listing and he took off several loads from the starboard side in an attempt to straighten her out. The fact that King brought back his crane operator that evening in an attempt to unload the scow and rearrange the cargo did not constitute a continuation or resumption of the earlier loading but rather a wholly new operation which had the unloading of the scow for its objective in an effort to keep her from sinking and to save the cargo.

It is undisputed that the scow had been brought down by Zeller; that the bargee Joyce who was to stay on her when she was being towed was a Zeller employee; that none of Schiavone-Bonomo's employees were aboard her; and that the loading was done exclusively by King and its employees.

There was some testimony that the bargee Joyce gave some suggestions for the rearranging of the cargo, but the fact is that King was directing orders to his crane operator—a responsibility and obligation which King could not legally shift to the bargee Joyce. Joyce, as bargee, occupied no position of authority and had no knowledge or experience in this work; in fact, the crane operator testified that he did not even remember seeing Joyce.

The certificate signed by Joyce that there was no damage to the scow and that it had been loaded and trimmed to his satisfaction does not absolve King of its obligation (Shamrock Towing Co. v. Schiavone-Bonomo Corp., D.C., 173 F. Supp. 39; 2 Cir., 275 F.2d 338; Rice v. New York Trap Rock, D.C., 198 F.Supp. 346; 2 Cir., 294 F.2d 272).

■ ■ That the loading was improperly done and not in fulfillment of King's duty to load and trim properly, and the direct cause of the loss sought to be covered does not convert the completed operation into a continuing one, even though King's duty to the scow and cargo might be a continuing one (Cf. Clauss v. American Insurance Company, 214 F.Supp. 442). The coverage here is clearly limited to liability for work in progress. The words of exclusion relied on by defendant are not words of art; they are to be given their normal, everyday meaning especially when no ambiguity is urged (Imperial Fire Ins. Co. v. County of Coos, 151 U.S. 452, 14 S.Ct. 379, 38 L.Ed. 231; Marcus v. United States Casualty Co., 249 N.Y. 21, 162 N.E. 571).

■ We conclude, therefore, that since the loading of the scow, improper though it was, had been completed prior to the careening of the scow and the dumping of the cargo, plaintiff's loss was excluded by the United States Fidelity and Guarantee exclusion pertaining to completed work and that United States Fidelity and Guarantee is not liable to King for the damages the latter may have to pay Schiavone-Bonomo.

We turn now to the exclusions asserted by Lloyd's and London Underwriters. In view of our holding that King was not covered by United States Fidelity and Guarantee, the one claimed exclusion "except to the extent of any valid and collectible insurance" does not apply leaving for determination solely the question of whether King was acting for the insured in any of the defined capacities—"agent, stevedore, or in any other capacity of the insured" in the use of the scow employed in the shipping of the scrap.

For several years prior to December 8, 1961, King had known, by reason of being advised orally by Schiavone-Bonomo that King was an insured named in Schiavone-Bonomo's policy. The insurance covered damages to the barge and the cargo.

The insurance was requested by King because Schiavone-Bonomo was handling practically all the scrap that King was shipping by barge or scows; that King was anxious to be relieved of responsibility as far as risk was concerned, which included both cargo and legal liability for barges loaded at King's dock; that Schiavone-Bonomo provided similar coverage to its other shippers at their yards; that throughout the years the cost was charged to King as an additional premium and presumably had been for the shipment in suit because it was reported to the underwriters; and that the policies in suit were those obtained in accordance with their agreement.

■ We have found that the loading had been completed prior to the loss and under the terms of the contract f. o. b. title to the cargo had passed to Schiavone-Bonomo.

We have found that, under its charter of the scow, Schiavone-Bonomo was primarily responsible to Zeller for the damage to the scow by King. We have also found that King was liable over to Schiavone-Bonomo for this loss. This liability of King does not arise out of any agency relationship. When loading and trimming the scow, King was acting solely for itself and performing work for which Schiavone-Bonomo intended to cover King and for which King understood it was covered. The relationship which existed between Schiavone-Bonomo and King at the time of the loss and which determines the covered activity was one arising from their separate contract which was neither one of employment nor of principal and agent.

Schiavone-Bonomo was the vendee of the steel and King the vendor; they had had similar transactions between them for many years. Under the terms of the contract between them, King was obligated to load the scrap on the scow chartered by Schiavone-Bonomo from Zeller. It was because of the very real risk of injury to the scow on which it worked in the conduct of its own business with attendant danger of possible liability arising out of its own independent acts that King sought and paid for coverage under the Schiavone-Bonomo policy.

This was understood by the parties; this was what King wanted; this was what Schiavone-Bonomo customarily procured for its other vendors. This was what the policy provided.

The awareness of this on the part of London and Lloyd's underwriters-defendants is clear from the language of the policy, which is replete with references to scow loading operations, from the fact that it was an open policy and that the premiums were set by reference to the number of barge operations within a period, and that each loading was reported to the underwriters in order to bring it within the coverage. It provided specific insurance on each loading for which the underwriters received a specific additional premium. The language of the policies—while acting as "agent, stevedore or in any other capacity of the insured"—reflects the relationship between King and Schiavone-Bonomo and contemplates coverage of a vendor and a vendee.

█ We have not had urged any contrary interpretation of the words "in any other capacity". We conclude that against the wording of this policy and the facts, the loss suffered by King when acting as vendor to Schiavone-Bonomo is encompassed by those words, and that King is covered under the London and Lloyd's policies to their proportionate extent. It follows that these insurers should have defended King. It is undisputed that the underwriters did offer to defend, reserving their rights to disclaimer—and that King rejected such an offer. What effect the defense would have had against the claim of plaintiff we are in no position to say but it was not a breach of the insurance contract on the part of King to reject such an offer and run the risk of an adverse decision. It was the duty of London and Lloyd's to defend; they were not privileged to impose conditions (Goldberg v. Lumber Mutual Casualty Co., 297 N.Y. 148, 77 N.E.2d 131). We conclude, therefore, that the London and Lloyd's

underwriters under paragraph "10" are liable for the costs and expenses incurred by King in defending the Admiralty suits 62 AD 138 and 62 AD 813.

Although this finding exonerates United States Fidelity and Guarantee from liability for the costs incurred by King in defending and prosecuting these suits, this is not because there was no duty on it to assume the defense of King unconditionally, but because we have found that the loss did not fall within the policy liability. United States Fidelity and Guarantee is under no obligation to doubly reimburse King nor to share this expense with other insurers found to be liable for the loss.

There was a duty on all defendants here to defend; not only was the claim not groundless or false on its face but the allegations of the libel and the impleading petition showed coverage under all the policies, irrespective of eventual liability. We find, therefore, that United States Fidelity and Guarantee as well as London and Lloyd's had a duty to unconditionally defend at the inception of these suits; but that because of the finding of liability against the London and Lloyd's underwriters, it is they who are responsible for making King whole. The consent of the "assurers" required under paragraph "10" of the policy is deemed to have been given, in view of the undisputed fact that it offered conditional defense, which we have found King was under no obligation to accept.

This opinion constitutes the Findings of Fact and Conclusion of Law in Action 64 Civil 431 and in the cross-claim pleaded by King in 62 AD 813.

Let appropriate judgments in accordance with the foregoing be submitted on five (5) days' notice of settlement. If the parties cannot stipulate as to the amount of damages to be awarded, an interlocutory and immediate partial judgment may be submitted determining liability, for we find no just cause for delay in the entry of such partial judgment. So ordered.