**ATLANTIC GULF & PACIFIC CO., as owner of THE Steel Barge, A. G. & P. No. 43 and the cargo thereon, Libelant,**

v.

**Tug THE BARNEY TURECAMO, her engines, boilers, tackle, etc., and Turecamo Coastal-Harbor Towing Corp., Respondents.**

United States District Court
S. D. New York.
Feb. 5, 1962.

Foley & Martin, New York City, for libelant. John H. Hanrahan, New York City, of counsel.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, for respondents. Henry C. Eidenbach, Thomas P. Pender, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

This suit in admiralty, tried before me, arises out of the capsizing and sinking of the barge A. G. & P. No. 43 with deck cargo aboard in Long Island Sound in the early morning of October 14, 1957 while in tow of the tug Barney Turecamo.

Libelant, Atlantic Gulf & Pacific Co. is a marine contracting and dredging company incorporated in Virginia and having a place of business in the City of New York. It sues as owner of the No. 43 for damages resulting from the loss of the barge and its cargo. Claimant, Vincent G. Turecamo, Inc. is the owner of the tug Barney Turecamo, the libeled vessel, which was operated and controlled by respondent Turecamo Coastal-Harbor Towing Corp. This court has jurisdiction over all of the parties and the libeled vessel.

The facts as they developed at the trial and as I find them to be are as follows:

On October 13, 1957 the libelant had completed dredging operations at Chatham Roads, Massachusetts. Its next operation was at Port Jefferson, Long Island. Libelant's employees loaded the equipment used on the Chatham Roads job aboard several of its own barges, among which were the No. 43, the sunken vessel, and the No. 44, for towing to Port Jefferson. The loading was done under

the supervision of Benson, libelant's superintendent in charge of the operations at Chatham Roads, and Captain Syvertsen, the deck captain of libelant's dredge Barlow.

The No. 43 was a steel barge built in 1941, 92 feet long, 26 feet wide, 6½ feet deep, gross and net tonnage 138. She had been used as a water barge during the Chatham Roads dredging operations. Heavy equipment was placed aboard her weighing approximately 70 tons, which included a pump case, two welding machines, four cutter spiders, a steel sheave, ball joints, pontoon pipe and steel bars. Some of this equipment was welded to the deck with steel strapping. The rest was strapped down with steel cables and turnbuckles.

After the cargo was made fast and the hatches closed and dogged, the barge was inspected by Benson and Syvertsen preparatory to turning it over to the tug engaged to tow it to Port Jefferson. When loaded some of the equipment stood roughly 9 feet about the deck of the 43 and with the equipment aboard she had a freeboard of some three to four feet.

Pursuant to oral agreement respondent Turecamo Coastal-Harbor Towing Corp. had undertaken to tow several of the loaded barges to Port Jefferson and the tugs, Barney Turecamo and Turecamo Girls which it operated, arrived at Chatham Roads for that purpose. The Barney Turecamo is 89 feet long, 25 feet wide and 11½ feet deep, gross tonnage 167, net tonnage 114 and 1600 horsepower. She was built in 1956. The Turecamo Girls, built in 1933, is a somewhat smaller and lighter tug than the Barney, with 1435 horsepower.

About 11 a. m. on the morning of October 13 the Turecamo Girls took in tow the barges A. G. & P. No. 53 and M. C. S. No. 501 at the Chatham Roads buoy and set off for Port Jefferson. The Barney Turecamo engaged its tow at the same place and set out about an hour later. Other vessels left for Port Jefferson as well, including libelant's dredge Barlow in tow of its tug Minnie S.

The Barney Turecamo tow consisted of the two barges No. 43 and No. 44. Both were unmanned. The No. 44 was the forward barge in the tow made fast to the tug by an 800 foot main hawser. An intermediate hawser of some 700 feet was drawn from the port stern bitt of the No. 44 and made fast by a bridle to the port and starboard bitts of the 43. The engagement of the tow by the Barney was supervised by its mate Olson, then on watch.

Shortly after the Barney Turecamo left Chatham Roads with its tow en route for Port Jefferson, Captain Davis, its master, relieved Olson on watch. The two stood watches six hours off and six hours on.

The Barney, with its tow, proceeded without incident through Nantucket Sound and the Race off Fisher's Island and down Long Island Sound. The weather was clear with a 10 mile north wind. Since she was the bigger, newer and more powerful vessel the Barney, moving at up to 10 knots through a smooth sea, overtook and passed the Turecamo Girls with its tow.

The mate Olson had relieved Captain Davis on the watch ending at 12 midnight on October 13. Some time before midnight Captain Davis arrived in the pilot house to relieve Olson, as was his custom. The Barney by then had passed New London five or six miles astern and Port Jefferson was approximately 47 miles away. After a brief discussion with Olson, Captain Davis, on scanning his tow, noticed that the red port light on the No. 43 was high in the water. He immediately reduced his engines to quarter speed and had Olson call libelant's dredge Barlow of which Syvertsen was the deck captain.

Olson spoke to someone on the Barlow whom Olson and Davis believed identified himself as "Captain Olson". There is little doubt that this was in fact Captain Syvertsen. There is some conflict as to the ensuing conversation. However, it appears that the Barlow told the Barney that No. 43 was a water barge, that she had airtight compartments, and that the

Minnie S. with the Barlow in tow would be up shortly to render whatever assistance she could. Olson and Davis also testified that they were instructed by the Barlow to continue on course to Port Jefferson. Syvertsen denies that such instructions were given. Whether they were or not is of no major significance here.

Shortly thereafter, when the Barney was in the vicinity of Bartlett's Reef the No. 43 turned turtle, rolling completely over in the water. She continued to tow well, however.

At about 1:45 a. m. on the morning of October 14 the Turecamo Girls came up to the Barney tow and inspected it. Captain Hundley, the master of the Turecamo Girls reported to Captain Davis that the overturned No. 43 was riding well and looked all right. He watched her for about 45 minutes, playing his light on her. He suggested that Davis increase the Barney's speed to see how the No. 43 would react. But when that was done the 43 began to wobble in the water and the Barney returned to quarter speed. At that speed the No. 43 appeared to be towing well with her bottom about a foot above the water.

About 2 a. m. there was another conversation between the Barney and the Barlow to the same general effect as the earlier one. The Barney continued toward Port Jefferson at reduced speed. However, at 4:45 a. m. when the Barney was some three miles west of Six Mile Reef and some fourteen miles to the westerly of the place where the No. 43 had turned turtle, the barge sank. The Minnie S. had not arrived in time to offer assistance while the 43 was still afloat.

Libelant contends that the capsizing and eventual loss of the No. 43 were caused solely by the fault of the tug Barney and her officers. Its first contention is that the No. 43 turned turtle (a) because the Barney failed to keep her under proper surveillance and (b) because the Barney was proceeding at excessive speed. Secondly, libelant maintains that the Barney was at fault in continuing on course to Port Jefferson after the No. 43 had turned turtle instead of beaching her somewhere along the Connecticut shore.

■ The libelant's first contention that the No. 43 turned turtle because of the fault of the Barney is completely unsupported by the evidence. The burden is plainly on the libelant to prove fault, (Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 76 L.Ed. 699 (1932) ), and the libelant has failed to sustain that burden.

To establish that the tow was not kept under proper surveillance libelant necessarily relied on the uncontradicted testimony of the Barney's mate Olson as to what he did during his watch. Olson testified that he looked over the tow at intervals of not more than ten minutes and that he considered this a constant watch. It could scarcely be argued with any reason that Olson was required to keep the tow under literally continuous observation in view of his duties in the wheelhouse, and the responsibilities with which he was charged. There appears no reason to question Olson's testimony as to what he did and his procedure appears to have been reasonable and proper under the circumstances. A. S. Wikstrom, Inc. v. The Julius C. Moran, 190 F.Supp. 250 (S.D.N.Y.1960). The mere fact that Captain Davis shortly after he arrived in the wheelhouse noticed the red light of the No. 43 somewhat high in the water, is certainly no indication that Olson was derelict in his duty. For all that appears the list in the barge may have occurred minutes, or even seconds, earlier and may have been due to a variety of causes.

■ I therefore find that libelant has failed to establish that there was fault or negligence in keeping proper watch over the No. 43.

Libelant has also failed to establish that the Barney was proceeding at an excessive speed which caused the No. 43 to turn turtle. The Barney was traveling at speeds up to 10 knots and passed the slower Turecamo Girls which had left Chatham Roads an hour before it. There is nothing in the record to show that a

speed of 10 knots was excessive, and, indeed, no evidence as to what a proper rate of speed would be. There was nothing in the condition of weather or sea which would indicate that this speed was excessive. Plainly the speed of the Turecamo Girls is no measure of comparison since she was an older and smaller and less powerful vessel.

The record does not support an inference that the No. 43 took any water through her decks as a result of the speed at which she was being towed. For all that appears the No. 43 may have turned turtle as a result of the shifting of her heavy deck cargo which had been loaded by libelant's own employees and for which the Barney was in no way responsible. Other possibilities might suggest themselves but there are none from which a fair inference can be drawn that the speed of the tug had anything to do with the capsizing of the 43.

■ I find that libelant has failed to establish that the Barney proceeded at excessive speed or that its speed caused the No. 43 to fill or capsize.

Finally, libelant contends that the Barney and her officers were at fault for not beaching the No. 43 on the Connecticut shore after she turned turtle instead of attempting to tow her to Fort Jefferson. On this contention it is unnecessary to resolve the conflict in testimony as to whether or not instructions were received by the Barney from the Barlow to continue to Port Jefferson. I will assume for purposes of this discussion that no such instructions were given.

■ Relying on The Joseph F. Clinton, 250 F. 977 (2 Cir. 1918) libelant maintains that if a barge in tow capsizes the burden shifts to the tug to show that it was not at fault. However, in that case the suit was upon contract and not upon tort. The case is clearly distinguishable and its reasoning is not applicable here. Sternberg Dredging Co. v. Moran Towing & Transportation Co., 196 F.2d 1002 (2 Cir. 1952) on which libelant also relies is likewise inapplicable. There it was held that the burden of going forward

shifted to the tug where it had been found that the initial difficulties of the barge were due to the fault of the tug in failing to keep her under proper observation. Here there is no evidence of fault on the part of the Barney which led to the initial difficulties of the No. 43 and I have found against libelant on that contention. As far as appears here the Barney kept No. 43 under proper watch and up to the time she turned turtle acted reasonably and properly under all the circumstances. The burden therefore remains on libelant to establish that the Barney did not "exercise such reasonable care and maritime skill as prudent navigators employ" under similar circumstances. Stevens v. The White City, supra, 285 U.S. p. 202, 52 S.Ct. p. 348; Aldrich v. Penn. R. Co., 255 F. 330 (2 Cir. 1918).

■ The question on this phase of the case is not whether the Barney could or could not have successfully beached the No. 43, or whether beaching her would have been the wisest course to pursue under the circumstances. Nor is it whether or not the master of the Barney, when faced with the choice of which course to pursue, chose the one which later proved to be erroneous. "Navigators are not to be charged with negligence, unless they make a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown." The Clarence L. Blakeslee, 243 F. 365, 366 (2 Cir. 1917).

The testimony of defendant's expert witness, Captain Cooey, that he would have attempted to beach the barge rather than try to tow her to Port Jefferson does not aid the libelant. Cooey was not present at the scene and was not faced with the necessity of making the decision. As Judge Mayer pointed out in The Mary T. Tracy, 298 F. 528, 530 (S.D.N.Y. 1920):

"The contrary view as testified by Capt. Nott called as an expert is but the old story of being able to tell, after the event, what should have been done, where the critics

were not there, and were not confronted with the problem nor the emergency. There is always a Capt. Nott. Sometimes he sits by the cozy fireside, and sometimes he testifies in a courtroom. He recites how it could have been better managed, but, if the responsibility had been his, he would have been worried sick, and probably would not have done half as well."

Captain Davis of the Barney was faced with two alternatives. Either he had to attempt to beach the No. 43 on the Connecticut shore or he had to attempt to tow her to Port Jefferson. Both alternatives involved hazards.

The Connecticut shore immediately to the north of his position in the Sound, and for several miles east and west, was rocky, with a number of reefs offshore and was unsuitable and, indeed, dangerous for a beaching operation. While there were places where such a maneuver might have been successfully accomplished in the vicinity of New London harbor, that haven was more than five miles astern. To beach the vessel there would have involved a 180 degree turn of the tow at night and difficult and dangerous maneuvers in the comparatively narrow channels of New London harbor to be successful. The required 180 degree turn itself, involving, as it did, the probable necessity of shortening the tow lines on two unmanned barges at night, one of which was overturned, presented hazards both to the members of the crew engaged in shortening line and to the tow itself. To attempt the turn might in itself have caused the No. 43 to wallow and sink. The maneuver also would have taken considerable time. Captain Davis was well aware of these difficulties.

On the other hand, the overturned No. 43 was towing well at reduced speed and it might well have been that further difficulties with her would have been avoided. The Turecamo Girls had made a careful and lengthy inspection of the overturned barge after she came up and Hundley, her captain, had reported that she seemed to be doing well.

It is true that the No. 43 in her overturned condition was somewhat low in the water. But this did not necessarily indicate that she was shipping water with any rapidity, or was in serious danger of sinking, particularly in the light of the information which the Barney had received from the dredge Barlow that she had airtight compartments. For all that appears here the very fact that she turned turtle with the heavy deck cargo aboard may have set her deeper in the water.

■ It certainly cannot be said that it was bad seamanship for Captain Davis to decide that there was a good chance that he could successfully negotiate the distance to Port Jefferson and bring the barge to safety there rather than to risk the hazards of attempting to beach her on the Connecticut shore. Whether or not, as a matter of hindsight, the latter course would have been better than the former (and there was nothing to show that it would have been), is beside the point. The master's decision is not one "which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances then present."

One further point might be mentioned briefly. The libelant attempted to show that the bridle of the intermediate hawser running to the No. 43 had not been secured properly to the bitts aboard her and that this had something to do with her loss. Quite apart from the fact that this claim was never asserted until the trial was practically over and was plainly an afterthought, libelant failed to establish that even had the bridle not been made fast in a proper manner this would have had anything to do with the loss of the barge.

I find that the libelant has failed to establish that the loss of the No. 43 was caused by negligence or fault on the part of the Barney Turecamo or its officers. The libel must therefore be dismissed.

A decree will be entered accordingly.

The foregoing constitute my findings of fact and conclusions of law in this case.

It is so ordered.