**SOUTH, INC., as owner of the FERRY-BOAT VEGA, Libellant,**

**v.**

**MORAN TOWING & TRANSPORTATION CO., Inc., Respondent,**

**and**

**TUG CHRISTINE MORAN, her engines, etc., Tug Claire A. Moran, Inc., Claimant.**

**MORAN TOWING & TRANSPORTATION CO., Inc., Cross-Libellant,**

**v.**

**SOUTH, INC., Cross-Respondent.**

Nos. 61 Ad. 964, 61 Ad. 1480.

United States District Court
S. D. New York.

Aug. 16, 1965.

Hardin, Hess & Eder, New York City, for libellant.

Burlingham, Underwood, Barron, Wright & White, New York City, for respondent.

CANNELLA, District Judge.

Libel to recover damages sustained by the libellant, South, Inc., as a result of the loss of her vessel, the ferry Vega, while in the tow of the respondent's tug Christine Moran, is dismissed.[1]

Decree on cross-libel, by Moran Towing & Transportation Co., Inc., to recover its damages due to the aforementioned loss shall be entered.

The instant action was submitted to the court solely on the issue of liability. Since the court finds that liability has been established on the cross-libel, the question of damages is reserved for the determination of a commissioner.

The court finds jurisdiction over all aspects of the action.

The within action was tried before this court, without a jury. The taking of evidence was concluded on March 25, 1965.

The libellant, South, Inc., is a corporation duly organized and existing under the laws of the state of Florida. Respondent, Moran Towing & Transportation Co., Inc., is a corporation incorporated under the laws of the state of New York. Tug Claire A. Moran, Inc., the claimant, is the corporate owner of the tug Christine Moran.

On January 5, 1961, the libellant purchased three ferries from Sunrise Ferries, Inc. for a total cost of $60,000. The vessels purchased were the Vega, the Deneb and the Altair. Each of these ships was substantially identical in its construction. The physical dimensions of the Vega, noted by stipulation in the pre-trial order, were as follows: 84 gross tons; registered length 61.9 feet; registered breadth 38.9 feet; registered depth 8.0 feet. The Vega was built at Port Richmond, New York in 1946.

South, Inc. and Moran Towing & Transportation Co., Inc. entered into a contract of towage on January 9, 1961. Respondent agreed to furnish a seagoing tug to tow the three vessels from New York to Norfolk, Virginia. Agreement was made to take the ferries in a single tow to their destination. As part of the towage contract, libellant was required to fit out and maintain the three ferries for towage in a sufficient and proper manner. The arrangements included the installation of lights and compliance with all additional requirements of the underwriters' surveyors.

Prior to the execution of the towage contract, libellant had sought to obtain insurance. The underwriters appointed Edward Ferenczy, a marine surveyor, to examine the vessels and submit any recommendations required to prepare the ferries for the tow. Ferenczy's inspection of the Vega indicated some pitting, although no excessive corrosion, which caused some misgivings over the condition of the Vega's plating. For this reason, he recommended that she be drydocked for further examination. Libellant did not drydock the Vega and insurance coverage was refused.

The surveyor Ferenczy also detailed recommendations for the installation of equipment aboard the vessels to best effectuate the proposed make-up of the tow. As a result, two six foot long angle irons were welded to the deck of the Vega, one on either side of amidships, each with a hole in either end. The towing hawser

---

1. A second cause of action contained in the libel, to wit, loss of the salvage value of the vessel due to the asserted negligent failure of the tug to mark the spot of the casualty, was withdrawn by the libellant.

was to be secured to a bridle and the two ends of the bridle were to be shackled in the holes nearest the bow. The intermediate hawser from the Vega to the Deneb, next in line in the flotilla, was to be secured in the same manner. Coastal Dry Dock & Repair Co. was engaged by the libellant to perform the necessary preparations which included boarding up of her windows and closing up of the deck and hull openings.

At the time the contract of towage was discussed and signed, the then vice-president of the libellant, Gordon Duke, engaged in conversation with Captain Leonard Goodwin who was operations manager for the respondent. Duke noted the character of the ferries to Goodwin and requested that the vessels be towed at a prudent speed. No specific recommendations of speed were mentioned by Duke and the manner of towage was left to the competence of the respondent.

The respondent assigned the tug Christine Moran to carry out the contract. The tug was 96.3 feet in length, 25.2 feet in width and 12 feet in depth. She was powered by a diesel electric engine of 1100 horsepower and had been placed into service during the 1950's.

The events of the voyage itself, beginning on the evening of January 10, 1961, were related to the court by two witnesses, Rodney Jones, Master of the Christine Moran and John Blaha, her First Mate. Due to the positioning of the three ferries at the Coastal Dry Dock & Repair Co. yard, the tug Claire Moran took the Vega in tow and turned her over to the Christine Moran at the Narrows. The Christine Moran had already taken the Deneb and the Altair in tow and when she rendezvoused with the Claire Moran, the Vega was placed as the lead ferry in tow, astern of the tug, followed by the Deneb and the Altair.

Prior to the commencement of the pick up at Coastal's yard, Rodney Jones had boarded the ferries to make an examination. He satisfied himself that all deck openings were closed and all windows boarded up but any other inspection was impossible since all openings to the interior of the vessels were secured. Also at that time, the respondent furnished the ferries with red and green 10-point side lights (port and starboard running lights) and a white all-around light set in position on the stern of each ferry. The lights were individually battery powered and were self-contained.

Before proceeding to an examination of the actual events of the voyage leading up to the casualty in question, certain other preliminary facts must be noted. Prior to commencement of the tow, on January 10, 1961, the Coast Guard at New York inspected the Vega and issued a permit for her to proceed unmanned in tow to Jacksonville, Florida. The evidence in addition indicates that no untoward event occurred during the time the Vega was in the tow of the Claire Moran prior to the meeting with the Christine Moran in the Narrows. The weather on the night of the tow was unquestionably ideal for towing. The visibility was excellent and the wind velocity was approximately five to six miles per hour. The water was smooth.

The hawser arrangement between the Christine Moran and her charges consisted of a main hawser to the lead ferry Vega of 8 inch nylon, approximately 1200 feet in length.[2] The intermediate hawser between the Vega and the Deneb was approximately 600 feet of 7 inch nylon and the one between the Deneb and the Altair approximately 600 feet of 8 inch nylon.

The tug, with the three ferries in tow, proceeded from the Narrows at about midnight of January 10, 1961. It passed Romer Shoal Buoy about 1 A.M. and moved past Scotland Light Vessel about 1:50 A.M. After that, the tug set her course southerly, parallel to the Jersey coast. The speed of the tow during the entire voyage ranged from zero to seven knots, at full throttle. The latter speed

**2.** Captain Jones testified that the main hawser had used about one-third of her effective life. Libellant has based no part of its claim upon any contention that the tug's hawsers were defective.

persisted for the duration of the trip along the Jersey coast.

Captain Jones testified that his watch aboard the tug ended at midnight and he left the bridge at about 12:45 A.M. First Mate Blaha had command during the early morning hours of January 11. Periodic watch was kept on the ferries in tow and the trip was uneventful until sometime around 4:30 A.M. At that time, about three miles from the Coast Guard station at Shark River, Blaha noticed that the three lights aboard the Vega were no longer visible. A sailor was sent below deck to summon Captain Jones. While word was being transmitted to the captain, Blaha turned on the radar to attempt to get a sighting of the Vega. After Captain Jones arrived in the wheelhouse, the Christine Moran's radar picked up three images on the scope. Radar contact was thus established with the Vega. Jones testified that the radar on board the tug was capable of discerning objects four feet and higher in the water.

To confirm the instrument sighting of the Vega, the tug, which had reduced speed upon failure to visually sight the ferry, turned around in a northerly direction until she came abreast of the vessel and to her west about 600 feet away. Captain Jones testified that the moon was shining in the east and that the Vega's silhouette could plainly be seen. The witnesses testified that the Vega was riding upright and as high in the water as before. Her silhouette appeared like that of her sister ferries.

Captain Jones was extensively questioned to probe the reason why the Christine Moran did not attempt to move closer to the Vega or send someone to board her. The tug had a lifeboat on board but Captain Jones stated that his fears for the safety of his crew, due to the difficulty of a boarding operation, dictated his choice not to approach any further. In addition, the visual contact with the Vega convinced the captain that there was no imminent danger to the vessel.

Having determined to continue on its regular course, the tug proceeded to turn slowly and head south. Once again the tug resumed full speed, about seven knots. After approximately twenty minutes, around 5:30 A.M., during which time the tow travelled no more than a mile or so, it was observed that the tug was no longer making the speed produced previously. After radar failed to pick up the Vega, speed was reduced to almost zero. The crew was alerted and the capstan engine was readied to begin shortening the main hawser. The hawser was shortened to within less than 300 feet of the Vega and she was sighted. With the aid of the tug's stern light, her bottom was observed and she had in fact turned upside down. No holes or other damage was observed in the ferry's hull.

Following communications to the Coast Guard and Moran's office, the tug attempted to head the Vega toward shore. The main hawser had been shortened but the effort to get the Vega closer to shore failed. Shortly after 6 A.M. on January 11, 1961, she sank. At the time the Vega went under, the main hawser extended about 300 feet to the tug and the intermediate hawser approximately 600 feet to the Deneb.

Prior to the arrival of a Coast Guard cutter from the Shark River station, Captain Jones testified that he took bearings to fix the position of the sunken vessel. The calculations indicated that she sank at Latitude 40 degrees 12 minutes north, Longitude 73 degrees 57 minutes west in 60 feet of water. Captain Jones ordered the main hawser severed. Although there is some dispute in the record, the court finds that following the arrival of the Coast Guard cutter and after it took bearings, Captain Jones ordered that the intermediate hawser between the Vega and the Deneb be cut. No buoy or other marker was placed to fix the position of the sunken vessel either by the tug or the Coast Guard.

Although both the tug and the cutter grappled for the Vega and searched the area, she was never found. Later on, the tug and the two remaining ferries proceeded back to New York. Subsequent examination of the Deneb and the Altair

revealed no hull damage. The inspection also disclosed shavings on the decks of the vessels, apparently still remaining from the work done prior to the voyage at the Coastal Dry Dock & Repair Co. yard.

There is little dispute between the parties on the facts which constitute the basis of libellant's claim. The controversy revolves around the legal conclusions to be drawn from the evidence. Thus the facts as found by the court must be examined in light of the applicable principles of law to determine if liability exists on the part of the respondent.

■ A contract for towage, such as effected by these parties, creates no bailor-bailee relationship and no presumptions of fault attach from the failure of the respondent to complete the tow of the Vega or turn her over intact to the libellant. Stevens v. The White City, 285 U.S. 195, 200, 52 S.Ct. 347, 76 L.Ed. 699 (1932); New York Trap Rock Corp. v. Christie Scow Corp., 162 F.2d 624, 627 (2d Cir. 1947); Waldie v. Steers Sand & Gravel Corp., 151 F.2d 129, 131 (2d Cir. 1945). An agreement to tow does not impose the liability of an insurer upon the tug (Stevens v. The White City, supra 285 U.S. at 202, 52 S.Ct. 347; Frederick Snare Corp. v. Moran Towing & Transportation Co., Inc., 195 F.Supp. 639, 641 (S.D.N.Y.1961); Allied Chemical & Dye Corp. v. The Christine Moran, 190 F. Supp. 703, 706 (S.D.N.Y.1961), modified 303 F.2d 197 (2d Cir. 1962)), nor that of a common carrier. Stevens v. The White City, supra 285 U.S. at 202, 52 S.Ct. 347; Frederick Snare Corp. v. Moran Towing & Transportation Co., Inc., supra 195 F. Supp. at 641; Allied Chemical & Dye Corp. v. The Christine Moran, supra 190 F.Supp. at 706.

■ The action on behalf of the tow against her tug lies *ex delicto* not *ex contractu* (Stevens v. The White City, supra 285 U.S. at 201, 52 S.Ct. 347) and thus the libellant must prove negligent conduct on the part of the Christine Moran constituting the proximate cause of the loss which ensued. Stevens v. The White City, supra, at 202; The Pride, 135 F.2d 999, 1002 (2d Cir. 1943); B. Turecamo Towing Corp. v. United States, 125 F.2d 1001 (2d Cir. 1942); Frederick Snare Corp. v. Moran Towing & Transportation Co., Inc., supra 195 F.Supp. at 641; Allied Chemical & Dye Corp. v. The Christine Moran, supra 190 F.Supp. at 706. The libellant is not aided by any presumption of negligence (Stevens v. The White City, supra 285 U.S. at 202, 52 S.Ct. 347; Shamrock Towing Co. v. Schiavone-Bonomo Corp., 173 F.Supp. 39, 44 (S.D.N.Y.1959), aff'd 275 F.2d 338 (2d Cir. 1960). See B. No. 90 Corp. v. The Helen L. Tracy, 1964 A.M.C. 145 (S. D.N.Y.1963)), and in fact, in offering its vessel for tow, holds her out as " * * * sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage." The Edmund L. Levy, 128 F. 683, 684 (2d Cir. 1904). See also, Southgate v. Eastern Transportation Co., 21 F.2d 47 (4th Cir. 1927); Frederick Snare Corp. v. Moran Towing & Transportation Co., Inc., supra 195 F.Supp. at 644; The Radnor, 21 F.2d 982 (D.Md.1927).

■■ Libellant thus has the burden of proof by a fair preponderance of the credible evidence (Stevens v. The White City, supra 285 U.S. at 202, 52 S.Ct. 347; Gulf Oil Corp. v. The Edward Card, 121 F.Supp. 461, 462 (E.D.N.Y.1954)) to establish that the loss of the Vega was caused by the failure of respondent's personnel to " * * * exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." Stevens v. The White City, supra 285 U.S. at 202, 52 S.Ct. at 350. See also Frederick Snare Corp. v. Moran Towing & Transportation Co., Inc., supra 195 F.Supp. at 641–642. In addition, a tow is presumed to be unseaworthy when she sinks under normal conditions, and in the absence of proof that she was improperly handled. Frederick Snare Corp. v. Moran Towing & Transportation Co., Inc., supra at 642; The Radnor, supra 21 F.2d at 983; The Senator Rice, 15 F.2d 882, 883 (E.D.N.Y.1925). See also Metropoli-

tan Coal Co. v. Howard, 155 F.2d 780 (2d Cir. 1946); Commercial Molasses Corp. v. New York Tank Barge Corp., 114 F.2d 248 (2d Cir. 1940), aff'd 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941).

 Libellant has here based its claim of negligence upon the assertion that the Christine Moran towed the Vega at an excessive speed causing her to be overtowed and eventually to capsize and sink. However, the evidence fails to establish that the tug was proceeding at an excessive speed. There is no evidence in the record that a full throttle speed of seven knots, considered with regard to the make-up of the tow and the surrounding weather conditions, was excessive and indeed no evidence in the record as to what a proper rate of speed would be. See Atlantic Gulf & Pacific Co. v. The Barney Turecamo, 202 F.Supp. 31 (S.D.N.Y.1964). Libellant sought to have Frank A. Sorensen testify as an expert on open sea towage. While his expertise in marine survey work, and his somewhat less formidable familiarity with harbor towing practices was established, his opinion that the Vega capsized due to being overtowed was not considered by the court since he was not shown to be an expert in this area.[3] Edward Ganley, a man of established expertise, testified that even a speed of eight knots could not cause the Vega to take water. The court finds that the libellant has failed to establish that the Christine Moran towed the Vega at an excessive speed.

 The court's attention must now be turned to the incident which occurred about 4:30 A.M. of January 11. At that time, noticing that the lights of the Vega were no longer visible, the tug made an inspection and then continued on its course south. There is of course no fault or negligence on the part of the tug for failure to have kept a continuous watch on the Vega prior to 4:30 A.M., for libellant does not even contend that there was any indication that the vessel required such extensive supervision. See Atlantic Gulf & Pacific Co. v. The Barney Turecamo, supra. In view of the explanation given by Captain Jones,[4] the court does not find any negligent conduct on the part of the Christine Moran for failure to do more than she did during the events following the 4:30 A.M. sighting. The court finds the conduct of the tug was consistent with the exercise of the maritime skill of a prudent navigator. In addition, there is no proof that even were the tug at fault at that time, her failure to act could be considered the proximate cause of the casualty.

 Libellant's cause is further hampered by its failure to rebut the presumption of unseaworthiness which exists since the Vega sank under normal conditions in the absence of proof that she was improperly handled. The only evidence which could be considered as rebutting the presumption fails in that task. The Coast Guard certificate issued for the Vega to proceed unmanned in tow does not establish prima facie proof of seaworthiness and need only be considered in the factual context of the case. See Frederick Snare Corp. v. Moran Towing & Transportation Co., Inc., supra 195 F.Supp. at 647 and cases cited therein. Furthermore, the inspection made by Captain Jones before the voyage commenced does not relieve the libellant of her warranty of seaworthiness (See A.

3. The deposition of Edward Ferenczy, introduced into evidence, has been considered by the court. Although his qualifications appear established, his off-hand conclusion that the Vega was overtowed " * * based perhaps on sixth sense" (Ferenczy deposition page 84) cannot be given more than minor weight.

4. Libellant has asserted that an erasure in the log of the tug should be construed as casting doubt upon the entire testimony given by the tug's personnel. The court accepts the explanation given for the erasure, that is, that the original entry was made under the wrong date. The instant case is clearly distinguishable from Lykes Brothers S. S. Co. v. Union Carbide & Carbon Corp., 253 F.2d 444 (5th Cir. 1958) and other similar cases cited by the libellant.

S. Wikstrom, Inc. v. The Julia Moran, 190 F.Supp. 250, 251 (S.D.N.Y.1960)) and the scope of his inspection, limited as it was by virtue of the work done to outfit the Vega for her sea voyage, cannot rebut the presumption. See Frederick Snare Corp. v. Moran Towing & Transportation Co., Inc., supra 195 F.Supp. at 645.

 While libellant has not disputed the general applicability of the principles announced in Stevens v. The White City, supra, it does suggest that in the context of this case, although the burden of proof does not shift to the respondent, nevertheless, since the libellant has no sources of proof available to it other than respondent's own personnel, the burden of coming forward with evidence to explain the loss should rest on the respondent. Libellant relies heavily on Sternberg Dredging Co. v. Moran Towing & Transportation Co., Inc., 196 F.2d 1002 (2d Cir. 1952), which is inapposite to the case at bar. The Sternberg rule, shifting the burden of coming forward with evidence of explanation, only comes into play when some fault has been established on the part of the tug. As that court expressed it, " * * * it does not follow that she should not be charged with the burden of producing evidence that *her fault* did not cause the damage." 196 F.2d at 1006 (Emphasis supplied). In the instant case, the libellant has failed to establish any fault on the part of the Christine Moran and the Sternberg rule is inapplicable. Furthermore, any reliance on the dicta contained in the concurring opinion of Judge Clark in B. Turecamo Towing Corp. v. United States, supra, 125 F.2d at 1002, is without force. The principles of law stated heretofore are applicable to this case.

 Mention should be made of certain doctrines obliquely adverted to by the libellant as in point here. The contention that the doctrine of res ipsa loquitur applies to these facts is without merit. Libellant has made no showing that this casualty " * * * was one that could not occur in the absence of the tug's negligence * * *." Frederick Snare Corp. v. Moran Towing & Transportation Co., Inc., supra 195 F.Supp. at 644. In addition, a claim that the respondent is liable here, even were the Vega unseaworthy, must fall. For the doctrine that a tug may be liable for failure to exercise due care in operation of an unseaworthy vessel, equated to principles of last clear chance (See American Bridge Div., U. S. Steel Corp. v. Roen Steamship Co., 328 F.2d 838 (7th Cir. 1964); Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2d Cir. 1961)), requires that there be some notice to the tug that her tow is in trouble with sufficient time to come to her aid. Such is not the case here. Finally, libellant invokes the doctrine of spoliation of evidence in support of its claim. Cases such as Austerberry v. United States, 169 F.2d 583 (6th Cir. 1948), Long Island Railroad Co. v. New York Central No. 25, 182 F.Supp. 100 (S.D.N.Y.1960) and The Algie, 56 F.2d 388 (E.D.N.Y.1932), cited by the libellant in support of its position, state no more than the general rule that an unfavorable inference may be drawn from the failure of a party to produce evidence in his control at time of trial. While Glen Southern Shipping Corp. v. Norfolk Towing Corp., 135 F.Supp. 146 (E.D.Va.1955) is of more aid to the libellant, the destruction of hawsers claimed to be defective in that case is a far cry from respondent's conduct here.

 In conclusion, libellant has failed to sustain its burden of proving that the loss of the Vega was due to any negligence on the part of the respondent, its proof at best leaving a finding of negligence to speculation. Additionally, libellant has failed to rebut the presumption that the Vega was unseaworthy. Considering all factors, the libel must be dismissed. Respondent is furthermore entitled to a decree on its cross-libel for the damage it sustained to the Christine Moran's towing gear. See Frederick Snare Corp. v. Moran Towing & Trans-

portation Co., Inc., supra 195 F.Supp. at 648.

The above shall constitute the court's findings of fact and conclusions of law.

Submit decree in accordance with this opinion.