HUDSON VALLEY LIGHTWEIGHT AGGREGATE CORP., as owner of the DECK BARGE SOLITE NO. 5, Plaintiff,

v.

WINDSOR BUILDING AND SUPPLY CO., Inc. and TUG CALLANAN NO. 1, Defendants.

No. 65 Ad. 495.

United States District Court
S. D. New York.

Oct. 30, 1969.

Macklin, Hanan & McKernan, New York City, for plaintiff, Timothy A. Hanan, New York City, of counsel.

Joseph Fennelly, Jr., New York City, for Windsor Building and Supply Co., Inc.

Platow & Lyon, New York City, for Tug Callanan No. 1, John P. Rowan, New York City, of counsel.

LASKER, District Judge.

In this admiralty action, the owner of a barge brings suit against the demise-charterer and the towing company for damage to the barge while it was in the charterer's possession and under tow by a tug.

Plaintiff, Hudson Valley Lightweight Aggregate Corp. ("Hudson Valley"), is the owner of the deck barge SOLITE NO. 5. Defendant Windsor Building and Supply Co., Inc. ("Windsor") chartered the barge pursuant to an oral charter. Both Hudson Valley and Windsor were shipping aggregate (sand and gravel) to a construction site at West Point, New York, and Hudson Valley coordinated the shipping arrangements for both companies. Hudson Valley engaged the tug CALLANAN NO. 1, owned and operated by the Callanan Road Improvement Co., to tow this particular shipment.

Hudson Valley delivered the SOLITE NO. 5 to Windsor's docking facilities on June 25, 1964. Between the hours of 8:00 A.M. and 12:00 Noon on June 26, 1964, Windsor's employees loaded the barge with approximately 898 cubic yards of heavy aggregate, which weighs about 2700 pounds per cubic yard. In the early morning of June 27, 1964, the tug CALLANAN NO. 1 arrived at the Windsor installation to take the loaded barge in tow. The parties have stipulated that at this time the barge was loaded on an even keel and had about three or four inches of freeboard.

The tug CALLANAN NO. 1 towed the barge out of the Windsor docking area via a man-made channel measuring 600 feet in length, 80 feet in width, and 12 feet in depth. Since the barge itself measured 38 feet in width, there was approximately 21 feet of clearance on each side as the barge traveled the length of the channel. After leaving the channel, and while in the Hudson River, the lines were let free and the tug circled around the rear of the barge. The barge was then made fast to the starboard side of the tug, and the trip to West Point began. It is stipulated that

throughout the voyage the weather was clear, the river was calm, and the average speed of the tow was "at least" six knots per hour. The tow was at a point just off Storm King Mountain, at approximately 3:00 A.M., when the crew of the tug noticed that the barge was taking a starboard list. The tug was then stopped in the hope that the barge would right itself, and when the situation did not improve the lines were released. A short time thereafter the barge capsized and the tug pushed it to the Hudson shipyard in Newburgh, New York.

## I. LIABILITY OF THE CHARTERER

Under the oral charter arrangements, Windsor had possession and control of the barge for the duration of the charter period. The arrangement was a demise charter. See Ira S. Bushey & Sons v. W. E. Hedger & Co., Inc., 40 F.2d 417 (2d Cir. 1930). Under a demise charter "the charterer's obligations are to redeliver the vessel in as good condition, ordinary wear and tear excepted, as that in which he received her * * *" Gilmore & Black, The Law of Admiralty, § 4–22, at 217. Since the barge in this case was returned in a damaged condition as compared to that existing at the time of delivery, a prima facie case is made against the charterer. Accordingly, the charterer must go forward with evidence to rebut this presumption. Tanker Hygrade No. 2 v. Barge Lines, Inc., 250 F.2d 678, 680 (2d Cir. 1957); Powell & Minnock Brick Works, Inc. v. Callanan Road Improvement Co., 210 F.Supp. 114, 115 (S.D.N.Y.1962). Elaborating upon this presumption, the Court of Appeals for the Second Circuit stated in In re Rice's Petition, 294 F.2d 272, 274 (1961):

"Although this presumption does not cast upon the charterer the burden of persuading the trier of fact that the accident happened without its negligence (Richmond Sand & Gravel Corp. v. Tidewater Const. Corp., 4 Cir., 1948, 170 F.2d 392), it does, nevertheless, re-

quire the charterer to come forward with evidence which shows 'either how the barge was injured, or that however that was, it was not due to his neglect. * * * The second alternative requires proof of all that the defendant has done with regard to it.' Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 1932, 60 F.2d 734, 736; * * *. Once this standard is met, the presumption disappears entirely and the question of negligence is for the trier of fact just as it would be in any other case where no presumption exists."

We hold that defendant-charterer Windsor has met the requirement to come forward with evidence that the accident "was not due to [its] neglect." As indicated below, we find that the evidence establishes that the SOLITE NO. 5 was not overloaded by Windsor, and there is neither evidence nor contention that Windsor was guilty of any other neglect.

■ Applying the rule set forth above, it therefore becomes necessary to determine whether plaintiff has sustained its overall burden by a fair preponderance of the evidence. We find that it has not done so. The maximum short tonnage carrying capacity of the SOLITE NO. 5 was 1200 short tons in fresh water and 1300 short tons in salt water. The water in the area was designated as "brackish" (between fresh and salt) by counsel for plaintiff.[1] The maximum short tonnage carrying capacity of the SOLITE NO. 5 would then have fallen somewhere between 1200 and 1300 short tons in the waters in question. An officer of Hudson Valley in 1964 testified at trial that the tonnage on the SOLITE NO. 5 on June 26, 1964, was 1181 short tons.[2] Plaintiff's counsel in their post-trial brief place the figure at 1193 short tons. At the trial plaintiff's expert calculated that the barge was carrying 1251 short tons on June 27, 1964, based upon a freeboard measurement of four inches. From the evidence before the court, it cannot be said that even 1251 short tons clearly

constituted an overload in the waters in which the capsizing took place.

■ We have said that plaintiff has not carried its burden on the issue of the overloading of the SOLITE NO. 5 by defendant Windsor. However, since Windsor was a bailee of the barge, it would be secondarily liable if the damage to the barge was brought about by the negligence of the tug. Shamrock Towing Co. v. Schiavone-Bonomo Corp., 173 F.Supp. 39 (S.D.N.Y.1959). The full determination of Windsor's ultimate liability, then, must depend upon a determination of the liability of the tug involved.

## II. LIABILITY OF THE TUG CALLANAN NO. 1

■■ The legal relationship between the owner of a barge and the tug owner is far different from the one between barge owner and charterer. As the Court of Appeals stated in South, Inc. v. Moran Towing and Transportation Co., 360 F.2d 1002, 1005 (2d Cir. 1966):

"The fact that the tow appeared to be in good order when delivered to the Tug and yet suffered damage before reaching its destination does not in itself raise a presumption of negligence; and this is so even where the tow was, as here, unmanned. Neither the Tug nor its owner is a bailee or an insurer."

See also Russell, Poling & Co. v. Tug Alice M. Moran, 205 F.Supp. 874 (S.D. N.Y.1962). Thus, in a suit against the tug owner, a barge owner is not aided by any presumptions. Since the suit is *ex delicto*, the barge owner "must prove negligent conduct on the part of [the tug] constituting the proximate cause of the loss which ensued." South, Inc. v. Moran Towing & Transportation Co., 252 F.Supp. 500, 505 (S.D.N.Y.1965). The Supreme Court, in Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699 (1932), stated that the tug owner's duty was to "exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." The burden of

1. Trial transcript, p. 38.

2. Trial transcript, p. 81.

proof in showing a breach of the tug's duty rests "upon those seeking to establish liability therefor." Central Railroad Co. of New Jersey v. Tug Marie J. Turecamo, 238 F.Supp. 145, 148 (E.D.N.Y. 1965).

Plaintiff here has not shown by a fair preponderance of the credible evidence that the tug CALLANAN NO. 1 was negligent. When the tug arrived at the Windsor dock, there were no visible indications that the barge should not have been taken out to sea. The tug towed the barge out of the channel in the customary and proper manner, i. e., putting the barge on a hawser behind the tug, with the captain of the tug steering from the rear-steering position, all the while facing the barge. Plaintiff theorizes that while the barge was passing through the channel it struck the side of the channel, shifting the load and thereby causing the capsizing of the barge in the channel. But plaintiff's theory is unsubstantiated, and there is no reason to doubt the testimony of the crew of the tug that the barge capsized in the Hudson River proper. To the contrary, it is difficult to conceive how the tug could have successfully removed the barge from the channel or why, if the capsizing occurred there, it would not have pushed the overturned barge to the nearby loading pier rather than to the relatively distant Newburgh docks. It is highly doubtful that the barge struck the side of the channel at all, since the captain of the tug testified that he had passed through the channel on approximately one hundred occasions and handled this towage exactly as he had handled scores of others without damage or accident. We therefore find the theory that the barge capsized in the channel unpersuasive, and turn to the plaintiff's alternate suggestion that the tug was negligent in that it was towing the barge at an excessive rate of speed.

Plaintiff contends that at a speed of six knots per hour sea water would be caused to wash on the deck of the barge, increasing the weight of the cargo. However, as in Atlantic Gulf & Pacific Co. v. The Barney Turecamo, 202 F.Supp. 31, 35 (S.D.N.Y.1962), plaintiff introduced no evidence that a speed of six knots is in fact excessive, nor did it attempt to demonstrate what a proper speed would have been under similar circumstances. As a consequence, plaintiff has not sustained its burden on the theory of excessive speed. To the contrary, as the Court of Appeals stated in South, Inc. v. Moran Towing and Transportation Co., supra (360 F.2d) at 1005:

"[T]here is a presumption that a vessel which is lost under normal conditions, with fair weather and calm seas, * * * was unseaworthy in the absence of proof that she was improperly handled. See Frederick Snare Corp. v. Moran Towing & Transportation Co., 195 F.Supp. 639, at 642 (S.D.N.Y. 1961) * * *."

The plaintiff not only has failed to sustain its burden on the issue of the tug's negligence, but it has offered no evidence to rebut this presumption of unseaworthiness of the barge. Under a contract of towage, the barge owner warrants the seaworthiness of the barge. Geo. W. Rogers Construction Corp. v. Tug Ocean King, 252 F.Supp. 657, 659 (S.D.N.Y.1965). The plaintiff here has failed to overcome the presumption of unseaworthiness arising from a sinking under such circumstances. The visual inspection made by the tug's captain does not relieve plaintiff of its warranty of seaworthiness. See A. S. Wikstrom v. The Julia C. Moran, 190 F.Supp. 250, 251 (S.D.N.Y.1960). Thus the plaintiff not only has failed to overcome the presumption of unseaworthiness,[3] but has also failed to sustain its burden of showing that the tug did not exercise reasonable care and skill in the performance of the towage.

Since we do not find that the capsizing resulted from any negligence on the part

3. Plaintiff did not introduce any evidence as to the condition of the SOLITE NO. 5 prior to the occurrence.

of Windsor or the tug, we do not reach Windsor's contention that it was covered under Hudson Valley's marine insurance policy as "associated or affiliated companies of the Assured." It appears, however, that Windsor may well have been an "affiliated" or "interrelated" company within the meaning of the insurance contract, both because of the common management of the two corporations and the fact that both companies were closely cooperating on a mutual project.

We hold that the capsizing of the barge SOLITE NO. 5 was not a result of the negligent actions of Windsor or the tug CALLANAN NO. 1, and find neither defendant liable to plaintiff Hudson Valley. Accordingly the complaint is dismissed as to both defendants.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

It is so ordered.